1  **JONES & DYER**
   **A Professional Corporation**
2  **1800 J Street**
   **Sacramento, California 95814**
3  **Telephone: (916) 552-5959**
   **Fax: (916) 442-5959**
4
   **MARK A. JONES, State Bar #96494**
5  **KRISTEN K. PRESTON, State Bar #125455**

6  Attorneys for: Defendants County of Lake, Lake County Sheriff's Department, Matthew
                 Wristen and Emil Devincenzi
7

8

9                  IN THE UNITED STATES DISTRICT COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11  MICHAEL BRAINERD,                       )  NO.  C 07 2663 EDL
                                            )
12                          Plaintiff,      )  **EXHIBIT A TO DECLARATION OF**
                                            )  **KRISTEN K. PRESTON IN SUPPORT**
13  vs.                                     )  **OF MOTION FOR SUMMARY**
                                            )  **JUDGMENT**
14  COUNTY OF LAKE; LAKE COUNTY             )
    SHERIFF'S DEPARTMENT                    )  Date:   July 22, 2008
15                                          )  Time:  9:00 a.m.
                            Defendants.     )  Courtroom E, 15th Floor
16                                          )  450 Golden Gate Avenue
    _____)  San Francisco, CA
17

18

19

20

21

22

23

24

25

26

27

28

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--

MICHAEL BRAINERD,                    )
                                     )
          Plaintiff,                 )
                                     )
     VS.                             )    No. C 07 2663 EDL
                                     )
COUNTY OF LAKE; LAKE COUNTY          )
SHERIFF'S OFFICE; and DOES 1         )
through 50, inclusive,               )
                                     )
          Defendants.                )
                                     )

--oOo--

DEPOSITION OF MICHAEL BRAINERD

VOLUME I

PAGES 1 THROUGH 149

--oOo--

Napa, California
Tuesday, March 4, 2008
10:10 a.m.

--oOo--

Reported by:   WENDY L. VAN MEERBEKE, CSR NO. 3676

Computer Aided Transcription

Sims & Sims
CERTIFIED SHORTHAND REPORTERS
Robert Louis Stevenson Plaza
Suite 308, 1700 Second Street
P.O. Box 117
Napa, California 94559

Napa            Fax             Toll Free
(707) 226-3022  (707) 226-7434  1-800-200-3022

"For over fifty years"

1   California.  That is a trailer park, so it's Space
2   4.   The ZIP Code is 95485.
3   Q.   How long have you lived there?
4   A.   I've been there a little -- about two years.
5   Q.   Where did you move from when you moved in
6   there?
7   A.   In the same neighborhood.  The home that I was
8   buying two years prior to that -- I was living in a
9   home then at that time.
10  Q.   Where was that located?
11  A.   5296 Blue Lakes Road.  All the rest is the
12  same.
13  Q.   And how long did you live at the 5296 Blue
14  Lakes Road address?
15  A.   Two years.
16  Q.   And then prior to living at that address, where
17  did you live?
18  A.   I lived in Potter Valley.  That address there
19  I'm trying to remember.  11051 Middle Mountain Road.
20  That's in Potter Valley, California.
21  Q.   How long did you live there?
22  A.   We were there for about five years.
23  Q.   How about prior to that; do you remember where
24  you lived before you lived at that address on Middle
25  Mountain Road?

1      MR. JONES:

2  Q.  Did you only own one house with the two of the

3  other folks that -- strike that.  There was one of

4  those incomprehensible questions.

5      Was it just the Blue Lakes house that you and

6  Bobby and Marci owned together?

7  A.  Yes.  Right.

8  Q.  How long had you known -- as of 2005, how long

9  had you known Bobby Boyd?

10  A.  I recollect about 15 years.

11  Q.  And how did you get to know him?

12  A.  When Marci and I -- when I took over the job as

13  the foreman in Ukiah for Industrial Electric Service

14  Company, we met him because he lived in the same

15  apartment complex that we were living in.  We got

16  together socially and met each other that way.

17      Like I say, our friendship was -- we had a good

18  friendship at that time.

19  Q.  And how long have you known Marci Ward?

20  A.  I've known Marci -- we were together 17 years,

21  almost 18 years before this incident happened.  I

22  don't recall when I first met her.

23  Q.  All right.  Did you have a romantic

24  relationship with Marci for some period of time?

25  A.  Yes.

1  Q.    You were living together as boyfriend and

2  girlfriend, in effect?

3  A.    Yes.

4  Q.    How long did that happen?  Tell me the period

5  of time you were together as a couple.

6  A.    Actively together in a relationship for --

7  romantically for about -- I'd say about 15 years of

8  that time.

9  Q.    And about what point in time did that

10  relationship break up?

11  A.    It tended to -- we tended to break it off when

12  we were residing in Potter Valley at that time.  She

13  didn't want to continue the relationship with me as

14  far as romance goes.  It kind of went downhill from

15  there.

16  Q.    So that was -- she broke off the relationship

17  before you and she and Bobby bought the house on

18  Blue Lakes Road?

19  A.    Right.  Yes.

20  Q.    And that was -- strike that.

21       Did you want the romantic relationship to

22  continue?

23  A.    Yes, I did.

24  Q.    So was the idea of you and Marci and Bobby --

25  whose idea was that to buy a house and all move in

1    or the other.  I did talk openly in front of both of

2    them.

3    Q.    About what?

4    A.    I said that I was sorry that I called her that.

5    And I would apologize for it in front of him also.

6    Q.    Over the course of the six months before your

7    arrest, did that situation -- that is, your

8    relationship with Marci in particular -- seem to get

9    worse or more conflict?

10   A.    Yes.

11   Q.    And can you describe for me or give me examples

12   of how that was getting worse, in your view?

13   A.    Because I was kind of -- at that time, I felt

14   as if I was a third party and that I wasn't involved

15   in all the everyday things that went on at the home.

16   They kind of left me out of -- you know, before all

17   this happened in this six-month period, I was always

18   driving her to the doctor, picking up her medicine

19   and things for her after work or something.  She'd

20   call me at work and say, "Would you please pick up

21   something for me?"

22        And then it got to the point where her mother

23   had some medical problems, so she wanted to fly down

24   and see her mother during that time.  I said -- I

25   just took it for granted I was going to take her to

1  Q.   And you were getting increasingly frustrated by

2  that?

3  A.   Yeah.   Because I would question them both.   I'd

4  say, "We bought this home together two years ago and

5  we've got to have some kind of stability in our

6  relationship to make this partnership work.   And I

7  feel like I'm not a part of that anymore."

8       I was very frank with them.

9  Q.   Did you ever make comments to her to the effect

10  of, you know, "Why do you want that fucker instead

11  of me?"

12  A.   No.

13  Q.   I've seen statements like that in papers I've

14  read.   You never made statements like that?

15  A.   I never made any statements like that to either

16  one of them.

17  Q.   Leading up to the arrest, do you remember what

18  day the arrest occurred on?

19  A.   I believe it was the 19th -- Thursday the 19th

20  of May of 2005.

21  Q.   During the few days before the arrest, do you

22  remember any particular arguments or confrontations

23  that you had with either Bobby or Marci?

24  A.   Yes.   I recall it was a number of days before

25  the arrest occurred.   I don't recall exactly when.

1  We were discussing some landscaping possibilities we
2  were going to do with the yards.  I was doing most
3  of the outside work.

4      She came out and made a statement in front of
5  Bobby and I that she didn't want anything this way.
6  "I want to have it this way."  I said, "You know,
7  that's not going to work."  I told her, "That's not
8  going to be something we can do financially or that
9  I can do myself."  It was out of my realm.

10     I said, "You know, you're not always right,
11  Marci."  When I did that, he jumped in my face at
12  the same time, and both of them came at me verbally.
13  Q.   What did Bobby say?
14  A.   He said, "You beest leave her out of this
15  conversation."  I says, "No.  She's not being left
16  out of this conversation.  She's a part of this
17  partnership in this home.  And you have to
18  understand that I alone -- that I myself am a part
19  of this.  So we have to all three agree on something
20  before it's going to happen.  Financially, you know,
21  Bobby, that we can't do this financially.  It's not
22  something that we could possibly do with a mortgage
23  payment and everything else."
24  Q.   How did they respond to that?  How did Bobby
25  respond to that?

1   A.    He argued with me.  We had words between each

2   other.  Finally I said, "You know, I've had it."  I

3   went to work out in the front yard and told them,

4   "I've just got to quit this right now.  I've got to

5   get out of here."  I walked out and did work in the

6   front yard.

7   Q.    When you said you had words, that doesn't

8   really tell me what was said.  I take it it was a

9   loud verbal argument?

10  A.    Yes.

11  Q.    You were yelling at each other?

12  A.    There were some harsh words said.  I don't

13  think it was screaming and yelling.  There were

14  harsh words between the three of us.

15  Q.    When you say, "harsh words," can you give me an

16  example of what you said and what they said?

17  A.    I told them, "Right now this situation is

18  between all three of us, and we should sit down,

19  relax and figure out what we're going to do here,

20  because more and more every day I'm getting pushed

21  out of this partnership.  I'm aware of it.  I feel

22  like that.  And I know that you guys are" -- she

23  knew how to push buttons because her and I had been

24  together for years.

25        They both kind of hung together.  They became a

54

1    Q.    Did you have a sense that this was kind of

2    building over the course of the six-month period?

3    A.    Yes.

4    Q.    And then Bobby got home about 4:30?

5    A.    Yeah.

6    Q.    Do you know if he was coming from work?

7    A.    He was coming home in his normal time.  He was

8    pretty much on time every night.  He was pretty much

9    the same.

10   Q.    Tell me what happened when Bobby got home.

11   A.    He got home.  At that particular time, they

12   were trying to buy me out.  They had mentioned in

13   that six-month period that they wanted to buy me

14   out.  I absolutely refused at the time.  I said,

15   "This is my home as much as it is your home.  We

16   have to come to some other conclusion because this

17   isn't the way that I want it to be."

18   Q.    Did you perceive that as just another effort by

19   Bobby and Marci to go on about their lives and ace

20   you out?

21   A.    Yeah.  And I called my real estate agent a

22   couple days prior to that to find out if it came

23   down to a buyout situation, how much money I would

24   be able to get out of the buyout.  So I talked to

25   the real estate agent that has been dealing with our

57

1    house since we bought it.  She told me, "Well, in
2    the real estate market where you're at, you can get
3    this much for the house, and I wouldn't take any
4    less than $27,000 for your buyout."

5    Q.    For your share?

6    A.    For my share of the buyout.  So I brought that
7    up in a conversation with Bobby when he got home.  I
8    says, "I've done some homework and I found out
9    before I even think of the possibility of you buying
10   me out -- you and Marci buying me out, I need to let
11   you know what I would think is a fair compensation
12   on the buyout."

13        I told him the amount that I discussed with the
14   real estate agent.  He absolutely refused that and
15   said, "I can't pay that."  He offered me -- it was
16   an amount of 10,000 or 11,000 less than what that
17   was.  I says, "No.  This house is too important to
18   me.  I can't do that.  If you can't compensate me
19   for the buyout then I refuse.  This is my home."

20        Then it was like -- then Marci started going in
21   saying -- you know, they were having words between
22   them, Bobby and Marci.  And then it was kind of like
23   gang-up time.

24   Q.    On you?

25   A.    Yeah.  I felt that -- I could feel there was a

1   that made you a little more angry?

2   A.    Marci said, "We couldn't buy you out even

3   together."  I said, "Then I don't understand why

4   we're having this conversation.  What is going on

5   with you two?"

6   Q.    And then what happened?

7   A.    And then he said something to me, and I can't

8   even recall the statement he said.  It made me

9   upset.

10  Q.    What was the nature of the comment?  Do you

11  remember anything about it?

12  A.    Yeah.  It was saying that I was less than they

13  were, that I'm just -- you know, I'm a bystander and

14  I shouldn't even be involved in this.  "We offered

15  to buy you out."  I said, "I know you've offered to

16  by me out and I've taken that into consideration.

17  I'm not going to be bought out financially that way

18  because it's not going to benefit me at all because,

19  in my opinion, I'm becoming a -- I'm doing this for

20  financial gain for me because I don't have a place

21  to live if I leave here."

22        And then the argument started.

23  Q.    And did the argument --

24  A.    Throwing accusations.  He was --

25  Q.    What else did he say, if you can remember?

1  A.   I don't remember now.  I don't remember.  I
2  don't recall.  I made a comment to him.  I was angry
3  and I made a comment to him.  I said, "What the hell
4  is going on with you guys?  What are you trying to
5  do?  You know that we're going to be in a really bad
6  situation if we sell the home or if you buy me out.
7  You can't afford, Bobby, to compensate everything
8  for this home.  That's why we are splitting the
9  financial arrangement, because we both know that
10  Marci doesn't have the income to do that."
11  Q.   So were you guys yelling at each other at this
12  point?
13  A.   Yeah.  Basically, we had -- we weren't
14  screaming and yelling at each other, but --
15  Q.   You're not talking like you and I are talking,
16  though?
17  A.   No.  We raised our voices, definitely.
18  Q.   Profanity?
19  A.   I told them, "What the hell."  I told Marci,
20  "What is your position in this whole thing?"  She
21  goes, "All you want me for is my pussy, anyway,"
22  excuse my French.
23  Q.   She didn't say, "Excuse my French"?
24  A.   No.  Just for this conversation.  I hate to say
25  that in mixed company.

1    Q.    I understand that.  It's important that I get

2    as much information as I can about this argument,

3    including whatever specific language.  If it's

4    profanity, then I need to hear it.

5    A.    Yes, it was profanity at that time.

6    Q.    What did you say when she said, "All you want

7    me for is my pussy"?

8    A.    I said, "Marci, you know we haven't had a

9    romantic relationship for a long time.  That's not

10   even a question here."

11   Q.    Are those the words you used?  "You know we

12   haven't had a romantic relationship here"?

13   A.    Yeah.  I recollect that.  "Why are you doing

14   this?  Why are you instigating here?  Why are you

15   doing what you're doing?  I don't understand."

16   Q.    How did she respond?

17   A.    She said, "Well, that's all you want."  I said,

18   "No, I don't, Marci.  We've been trying to work out

19   the situation with the home."

20   Q.    Was she yelling, too?

21        MR. POORE:  I have to do that conference call.

22   I apologize.  You're kind of right in midstream with

23   some questioning.

24        MR. JONES:  That's all right.

25   Q.    Was she yelling at that time, too?  All three

1  of you were yelling back and forth?

2  A.    Yes.  Off and on with each other.  Yes.

3         MR. JONES:  Off the record.

4         (Recess taken.)

5         MR. JONES:

6  Q.    We were discussing before lunch the argument

7  that was the confrontational argument that led up to

8  the arrest.  We were kind of at the point where

9  Marci had gotten involved and made some comments and

10 this argument was still going on.  I'm not sure

11 exactly where we left it.

12        As this argument escalated, I take it there

13 was -- strike that.

14        How long was this period of time between the

15 time Bobby got home and the time a sheriff's deputy

16 showed up; do you remember?

17 A.    If I recall right, it was 5:00 something that

18 the police entered the home.  I can't remember the

19 exact minute.

20 Q.    The report indicates 5:40.  Does that sound

21 about right?

22 A.    Yes.

23 Q.    So this argument had been going on for maybe an

24 hour?

25        MR. POORE:  You mean the argument itself that

1   he's talking about or just the whole --

2        MR. JONES:

3   Q.   The whole argument where Bobby comes home

4   and --

5   A.   It ended quicker than that because I went in my

6   room at one time and left the argument at the time

7   and went in my room before the police showed up.  I

8   would say 45 minutes.  Maybe 40, 45 minutes.

9   Q.   You said you went in your room at some point?

10  A.   At the end of the argument I did.  I walked

11  away and said that I've got to take myself out of

12  this thing.

13  Q.   When you went in your room, did you close the

14  door?

15  A.   No, I didn't close the door.  I just sat at my

16  desk in my room trying to calm down, trying to get

17  my thoughts together.

18  Q.   And when the deputy -- was there one deputy

19  sheriff that showed up?

20  A.   No.  Two officers showed up.

21  Q.   And were you -- where were you when you first

22  saw one of the officers?

23  A.   I was sitting at my desk and I heard some

24  voices in the hallway, and then the one officer

25  entered the room.  I don't remember his name.  And

1    Q.   And then there's several pages that are

2    attached.   It looks like they're additional

3    statements that are requested under subheading 19 --

4    item 19.   Is that your handwriting on those pages?

5    A.   No.   This is my paralegal's handwriting.

6    Q.   Is this information that you provided to your

7    paralegal?

8    A.   Yes.

9    Q.   I take it you reviewed this before it was

10   filed?

11   A.   Yes.

12   Q.   Take a look at page five of the handwritten

13   part.   You're referring to this argument and you

14   state at the top of the page, "As the officer took

15   me out the door, Mr. Boyd stood crying and Ms. Ward

16   ran across the street crying in fear."  You go on to

17   say how you couldn't believe it because you didn't

18   think you said anything that should have resulted in

19   your arrest.

20        Did you tell -- you reviewed that, and that's

21   accurate; isn't it?

22   A.   Yes, it is.

23   Q.   What was she afraid of?

24        MR. POORE:   Objection.   Calls for speculation.

25