**JONES & DYER**
**A Professional Corporation**
**1800 J Street**
**Sacramento, California 95811**
**Telephone:  (916) 552-5959**
**Fax: (916) 442-5959**

**MARK A. JONES, State Bar #96494**
**KRISTEN K. PRESTON, State Bar #125455**

Attorneys for: Defendants County of Lake, Lake County Sheriff's Office, Matthew
Wristen and Emil Devincenzi

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL BRAINERD | ) NO.  C 07 2663 EDL |
| Plaintiff, | ) **PROPOSED ORDER GRANTING** |
| vs. | ) **DEFENDANTS' MOTION FOR** |
| | ) **SUMMARY JUDGMENT** |
| COUNTY OF LAKE; LAKE COUNTY | ) Date:   July 22, 2008 |
| SHERIFF'S OFFICE; and DOES 1 through 50, | ) Time:  9:00 a.m. |
| inclusive, | ) Courtroom E, 15th Floor |
| | ) 450 Golden Gate Avenue |
| | ) San Francisco, CA |
| Defendants. | ) |
| _____ | ) |

This matter came before the Court on Defendants' County of Lake, Lake County Sheriff's
Office, Matthew Wristen and Emil Devincenzi Motion for Summary Judgment.  The Motion has
been fully briefed by the parties  For the reasons set forth below, Defendants' Motion is GRANTED.

**I.  INTRODUCTION**

    **A.**    <u>Summary of the Case</u>

This 42 U.S.C. section 1983 action arises out of the May 19, 2005 arrest and detention of
Michael Brainerd by the Lake County Sheriff as the result of threats of bodily harm made by
Brainerd against his roommate.  Brainerd was detained at the Lake County Jail until May 23, 2005
when he was released.  During his detention, he was provided medical services for Type I diabetes.

1   Brainerd alleges there existed no probable cause for his arrest, that he was unreasonably

2   seized by Deputies Wristen and Devincenzi and detained at the Lake County Jail without a timely

3   probable cause determination.  Plaintiff further alleges that during the period of his detention,

4   defendants were deliberately indifferent to his serious medical needs.

5   Defendants deny these allegations and seek summary judgment on all claims.

6   **B.   Plaintiff's Allegations Against Defendants**

7   Plaintiff's complaint contains four specific causes of action alleged *against all defendants*,

8   including "Unlawful Arrest," "Unreasonable Search and Seizure," "Failure to Provide Timely

9   Probable Cause Hearing," and "Illegal Incarceration/Failure to Provide Medical Treatment."

10   Brainerd alleges wrongful conduct by the individual defendants and <u>Monell</u> claims as against Lake

11   County and the Sheriffs Department, contending that the wrongful conduct alleged was in

12   accordance with unspecified custom, policy and practice of Lake County.  Brainerd seeks recovery of

13   compensatory damages against all defendants and punitive damages against Deputies Wristen and

14   Devincenzi.

15   **II.   STATEMENT OF FACTS**

16   **A.   The Living Arrangement**

17   As of May 19, 2005, Michael Brainerd ("Brainerd") was residing at 5296 Blue Lakes Road in

18   Upper Lake, California, with roommates Marci Ward ("Ward") and Bobby Boyd ("Boyd").

19   (Brainerd Deposition 11:13-15.)   Brainerd, Ward and Boyd each possessed an ownership interest in

20   the residence.   (Brainerd Deposition 44:5-7; 45:24-26:17.)  Brainerd had known Boyd for

21   approximately 15 years. (Brainerd Deposition 44:8-18.)  Brainerd had known Ward for 17-18 years.

22   (Brainerd Deposition 44:19-22.)   For 15 years Brainerd and Ward had lived together as a couple;

23   however, in approximately 2003, Ward broke off their intimate relationship.  Thereafter, they

24   continued in a platonic relationship as roommates.  (Brainerd Deposition 44:23-45:15.)

25   **B.   The Argument**

26   Ward and Boyd initiated discussions with Brainerd about purchasing his share of the

27   residence.  (Brainerd Deposition 57:10-58:19.)   Brainerd "absolutely refused" Ward and Boyd's

28   suggestion that they buy him out of the house.  (<u>Id</u>.)  Brainerd testified tension was building over the

1  preceding six months between the roommates.  (Brainerd Deposition 49:6-10; 57:1-3.)

2      Brainerd came home from work on May 19, 2005 and a verbal altercation ensued between the

3  roommates concerning their joint ownership of the residence.  (Brainerd Deposition 57:10-64:17.)

4  Brainerd admits that the roommates had been involved in verbal altercations in the days leading up

5  to May 19, 2005.  (Brainerd Deposition 52:21-54:14.)  Boyd's statements "upset" Brainerd.

6  (Brainerd Deposition 60:6-21.)  The two were yelling at one another with raised voices.  (Brainerd

7  Deposition 61:11-17.)  The argument escalated and Ward, Boyd and Brainerd were all three yelling

8  at each other.  (Brainerd Deposition 62:25-63:2.)

9      Brainerd claims that in the midst of the argument he left and went and sat in his room to

10  "cool off" with the door open.  He was sitting in his room when a Lake County Sheriff's Deputy

11  entered.  (Brainerd Deposition 64:3-20.)

12      **C.**    **The Arrest**

13      At approximately 5:40 p.m. on May 19, 2005, Lake County Sheriff's Deputies Matthew

14  Wristen ("Wristen") and Emil Devincenzi ("Devincenzi") were dispatched on a call reporting a

15  verbal altercation between roommates at a residence located at 5269 Blue Lakes Road in Upper

16  Lake, California.  (Wristen Declaration ¶3; Devincenzi Declaration ¶3.)  Upon their arrival at the

17  residence, Wristen and Devincenzi were told there were three residents of the home (Ward, Boyd

18  and Brainerd), each with an ownership interest.  Ward and Boyd, the complaining residents, reported

19  an argument pertaining to finances between the three roommates. Ward and Boyd reported to the

20  deputies that were attempting to purchase from Brainerd his share in the residence.  Ward and Boyd

21  reported to the deputies that, in the course of the argument, Brainerd became angry and got in Boyd's

22  face.  Boyd and Ward reported that Brainerd raised his fist as if he was going to strike Boyd.  They

23  reported that Brainerd then walked away and stated that he intended to get a baseball bat and hit

24  Boyd in the head with it.  (Wristen Declaration ¶4; Devincenzi Declaration ¶4.)

25      The deputies were given permission by Boyd and Ward to enter the residence where they

26  encountered Brainerd.  Upon questioning, Brainerd admitted to the officers that he made the threat

27  against Boyd but that he did not mean it.  Brainerd stated that he felt he was being "fucked with" by

28  Boyd and Ward.   Brainerd admitted that he had a baseball bat in his room.  The bat was actually

1    observed by the officers in Brainerd's room.  Wristen explained to Brainerd that a threat to hit

2    someone in the head with a baseball bat is a crime.  Brainerd responded to Wristen that Brainerd was

3    not going to be "fucked with" and that he would do what he had to do.  (Wristen Declaration ¶5;

4    Devincenzi Declaration ¶5.)

5        Throughout the time the deputies were at the residence, Boyd and Ward demonstrated in their

6    statements and in their conduct, that they were genuinely fearful of Brainerd.  Boyd was crying and

7    stated that he was sincerely frightened as a result of Brainerd's threat to strike him with a baseball

8    bat.  (Wristen Declaration ¶6; Devincenzi Declaration ¶6.)  Brainerd confirmed in testimony that

9    Ward was fearful and crying and that Boyd was also crying.  (Brainerd Deposition 75:12-22.)

10        Based on the circumstances presented to the deputies, Wristen and Devincenzi believed that

11   Brainerd threatened to physically harm Boyd with a baseball bat.  They observed that the baseball bat

12   was readily accessible to Brainerd.  Boyd and Ward appeared genuinely fearful.  Despite warnings of

13   the implications of his threats, Brainerd nonetheless indicated he would "do what he had to do."  On

14   the basis of these observations, the deputies determined Brainerd was in violation of California Penal

15   Code section 422 - Terrorist Threats.  (Wristen Declaration ¶7.)[1]  Wristen placed Brainerd under

16   arrest, advised him of the crime for which he was being arrested and advised Brainerd of his

17   constitutional rights.  (Wristen Declaration ¶7; Devincenzi Declaration ¶7.)

18        At the time Brainerd was placed under arrest, Wristen noted the odor of alcohol coming from

19   him.  Wristen asked Brainerd if he had been drinking.  Brainerd admitted to Wristen that he had

20   consumed a couple of beers after work.  (Wristen Declaration ¶8.)

21        The deputies transported Brainerd to the Hill Road Correctional Facility where Brainerd was

22   booked on the charge of violating California Penal Code section 422.  Brainerd reported to Wristen

23   at the correctional facility that Brainerd was sorry he had made the threat and that he would never

24

25        [1] California Penal Code section 422 provides in pertinent part:"Any person who willfully threatens to
26   commit a crime which will result in death or great bodily harm to another person, with the specific intent that
     the statement, made verbally . . . is to be taken as a threat, even if there is no intent of actually carrying it out,
27   which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate,
     and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution
28   of the threat, and thereby causes that person to reasonably be in sustained fear for his or her own safety . . . shall
     be punished by imprisonment . . ."

**PROPOSED ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
**CASE NO. C 07 2663 EDL**

H:\MAJ.cases\Brainerd v. Lake County\Pleadings\MSJ\MSJ - Proposed Order.wpd

1   hurt anybody.  (Wristen Declaration ¶9; Devincenzi Declaration ¶8)

2          Pursuant to Sheriff's Department procedures, Wristen prepared a narrative report regarding

3   the dispatch and the arrest.(Wristen Declaration ¶10, Exhibit A to Declaration; Esberg Declaration

4   ¶¶4 and 7, Exhibit A to Declaration.)

5          **D.     The Detention**

6                  **1.     Booking**

7          Pursuant to Lake County Sheriff's Department procedures, booking officers are required at

8   the time of booking to prepare a Booking Form, a Pre-Booking Health Form, and Intake

9   Questionnaire completed with input from the individual arrested.  In Brainerd's case, each of these

10  forms was completed.  (Esberg Declaration ¶¶ 6 and 7, Exhibits A and B to Declaration.)  Lake

11  County Jail personnel are specifically trained to summon medical care for inmate medical conditions

12  of which they become aware.  Once medical care is summoned for an inmate, medical personnel are

13  responsible for administering medical care to the inmate.  (Esberg Declaration ¶¶ 6, 7, and 8, Exhibit

14  B to Declaration.)

15                 **2.     Probable Cause Determination**

16         Pursuant to Department procedures, on May 19, 2005 Wristen prepared a Declaration for

17  Probable Cause and Bail Setting, setting forth under penalty of perjury information pertinent to the

18  dispatch and the arrest of Brainerd.  Pursuant to Department procedures, the Declaration was

19  submitted to a magistrate for determination of probable cause.  (Wristen Declaration ¶11, Exhibit B

20  to Declaration; Esberg Declaration ¶7, Exhibit A to Declaration.)

21         On May 21, 2005, the Hill Road Jail Facility was notified of an order issued by Lake County

22  Magistrate Halstrom that there was sufficient probable cause to detain Mr. Brainerd for a felony

23  violation of California Penal Code section 422.  (Esberg Declaration ¶11, Exhibit A to Declaration.)

24                 **3.     Medical Attention**

25         Medical services at the jail are provided pursuant to contract by California Forensic Medical

26  Group ("CFMG").  (Esberg Declaration ¶9.)

27         Wristen is uniquely familiar with diabetes as the result of his experience with family

28  members who suffer from this disease.  (Wristen Declaration ¶12.)   At the time of the arrest and

1  until Brainerd was left in the booking area of the Lake County detention facility, Wristen did not

2  observe any signs of diabetic distress from Brainerd.  (Wristen Declaration ¶13.)  At no time while

3  he was in the presence of Wristen and/or Devincenzi, did Brainerd exhibit or express the need for

4  medical evaluation or treatment for any condition.  (Wristen Declaration ¶14; Devincenzi

5  Declaration ¶10.)

6      At the time Brainerd was booked, the Pre-Booking Medical Information Report and Intake

7  Questionnaire were completed reflecting that Brainerd is a Type I diabetic.  (Esberg Declaration ¶8.)

8  Information concerning Brainerd's medication was also obtained from him.  (Id.)

9      On the basis of the information obtained from him, Brainerd was immediately referred to

10  CFMG medical personnel for monitoring and management of his medical conditions.  (Esberg

11  Declaration ¶8, Exhibit C to Declaration.)  Documentation of Brainerd's medical treatment reflects

12  his first contact with medical personnel was at approximately 6:33 p.m. May 19, 2005 when his

13  blood sugar was first tested.  In accordance with the contract to provide detainees medical services,

14  all medical treatment administered to Brainerd, including medications, was provided by medical

15  personnel from CFMG, not Lake County jail personnel.  (Esberg Declaration ¶9, Exhibit C to

16  Declaration.)

17          **4.    Release**

18      On May 23, 2005, the Hill Road Jail Facility received notification from the Office of the

19  Lake County District Attorney that charges for Brainerd's violation of Penal Code 422 would not be

20  pursued and that Brainerd was to be released pursuant to the provisions of Penal Code section 825.

21  In accordance with this notification, Brainerd was released from the Hill Road Jail Facility on May

22  23, 2005 and was provided a "Detention Certificate" at the time of his release.  (Esberg Declaration

23  ¶11, Exhibit D to Declaration.)  Brainerd's release was delayed for a short period of time because jail

24  personnel were notified that a temporary restraining order was issued against Brainerd and would be

25  transmitted to the jail for service on Brainerd before his release.[2]  The Order was ultimately received,

26  ─────────────

27  [2] Court records of which defendants request judicial notice be taken reflect that Ms. Ward sought a temporary restraining order for the protection of herself and Mr. Boyd on May 19, 2005 - the same day Brainerd

28  was arrested.  In her petition, Ms. Ward complained under penalty of perjury that Brainerd was verbally abusing her and Mr. Boyd for the preceding 6 months and that the abusive behavior was escalating.

**PROPOSED ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. C 07 2663 EDL**

1  served on Brainerd, and Brainerd was then released from custody in the morning on May 23, 2005.

2  (Esberg Declaration ¶13.)

3  **III.    ARGUMENT**

4          **A.    Standards of Summary Adjudication**

5          A defendant may obtain summary judgment when "there is no genuine issue as to any

6  material fact . . ." (Fed. R. Civ. Pro. 56(c).)   In deciding whether a genuine issue of material fact

7  exists, the court's inquiry "must be guided by the substantive evidentiary standards that apply to the

8  case." (Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2509 (1986).)  In turn, those

9  standards are to be applied to "only disputes over facts that might affect the outcome of the suit

10 under the governing law . . . Factual disputes that are irrelevant or unnecessary will not be counted."

11 Id., at 248.

12         "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate

13 time for discovery and upon motion, against a party who fails to make a showing sufficient to

14 establish the existence of an element essential to that party's case, and on which that party will bear

15 the burden of proof at trial." (Celotex Corp. v. Catret, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986).)

16 Where a sufficient showing is not made, the moving party is entitled to judgment as a matter of law.

17 (Id., at 323.)

18
          **B.    The Uncontested Facts Demonstrate There Was No Unreasonable Seizure of
19                Brainerd and Probable Cause Existed for His Arrest**

20         Brainerd's first and second claims are properly considered in tandem.  "Unlawful arrest"

21 claims are more precisely framed as whether a 'seizure' for purposes of the Fourth Amendment

22 occurred.  In this instance, Brainerd alleges no 'seizure' separate from his arrest.

23         The deputies in this case were authorized to make a warrantless arrest of Brainerd where

24 probable cause existed for his arrest. (California Penal Code section 836(a)(2).)  To comply with the

25 Fourth Amendment, the arrest must be supported by probable cause to believe the arrestee has

26 committed a crime. (Caldarola v. Calabrese, 298 F.3d 156, 161 (2nd Cir. 2002).)  Probable cause is

27 defined in terms of facts and circumstances sufficient to warrant a prudent person in believing that

28 the suspect had committed or was committing an offense.  Officers have probable cause to make an

1  arrest when, "the facts and circumstances within their knowledge, and of which they had reasonably

2  trustworthy information, were sufficient in themselves to warrant a man of reasonable caution in the

3  belief" that an offense has been or is being committed. (Brinegar v. U.S., 338 U.S. 160, 176, 69

4  S.Ct. 1302 (1949).)  This subjective standard for determination of the belief that a felony is being or

5  has been committed is based on a totality of the circumstances. (Park v. Shiflett, 250 F.3d 843, 850

6  (4th Cir. 2001).)  "[P]robable cause is a fluid concept - turning on the assessment of probabilities in a

7  particular factual contexts . . ." (Illinois v. Gates, 462 U.S. 213, 232, 103 S.Ct. 2317 (1983).)

8  Probable cause is not capable of precise definition, rather turns on a *reasonable belief* of guilt

9  regarding the particular person subject to arrest. (Maryland v. Pringle, 540 U.S. 366, 371, 124 S.Ct.

10  795 (2003).)  Probable cause is determined by an objective, rather than subjective, standard.

11      Officers Wristen and Devincenzi had probable cause to arrest Brainerd because "the facts and

12  circumstances within their knowledge, and of which they had reasonably trustworthy information

13  [are] sufficient in themselves to warrant a man of reasonable caution in the belief that a [violation of

14  California Penal Code section] was being or had been committed." (Brinegar, supra, at page 176.)

15      The elements of making a criminal threat pursuant to Penal Code section 422 are: (1) a

16  willful threat to commit a crime that will result in death or great bodily injury to another person; (2)

17  the threat is made with the specific intent that the statement is to be taken as a threat, regardless of

18  whether there is intent to carry it out; (3) the threat is, on its face and under the circumstances in

19  which it is made, so unequivocal, unconditional, immediate and specific as to convey to the person

20  threatened, the seriousness and immediate possibility that the threat will be acted upon; (4) that

21  actually causes the person threatened to be in sustained fear for his own safety or the safety of his

22  immediate family; and (5) that the fear exhibited was reasonable under the circumstances. (In re

23  Sylvester C., 137 Cal.App.4th 601, 605, 40 Cal.Rptr.3d 461 (2006).)  However, the defendants are

24  not required to show that the facts known to Wristen and Devincenzi were sufficient to actually

25  prove Brainerd's guilt for violation of Penal Code section 422.  Rather, defendants are required to

26  establish that the officers were aware of facts that would cause a *reasonable person* to suspect a

27  crime had been committed. (Levin v. United Airlines, 158 Cal.App.4th 1002, 70 Cal.Rptr.3d 535

28  (2008).)

**PROPOSED ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
**CASE NO. C 07 2663 EDL**

1   In this case, the officers were presented with the statements of Brainerd's housemates, who

2   claimed Brainerd was threatening to do physical harm to Boyd, namely, strike Boyd in the head with

3   a baseball bat. Brainerd had the means available to carry out his threat.  Brainerd's victim Boyd was

4   fearful of his safety and was convinced that Brainerd would execute his threat.  Ward expressed a

5   similar belief to the officers that Brainerd's threat was serious.  While claiming to the deputies that

6   he "didn't mean it," Brainerd nevertheless confirmed that the bat was readily available to him and

7   that he would "do what he had to do."  The evidence demonstrates a reasonable belief on the part of

8   the deputies that a reasonable person would take Brainerd's threat seriously.  (Fogel v. Grass Valley

9   Police Department, 415 F.Supp. 1084, 1089 (E.D. Cal. 2006).)  The deputies were presented with

10   ample basis upon which to conclude that Brainerd committed a violation of Penal Code section 422.

11   It is anticipated that Brainerd will deny making any threats, deny his access to the baseball

12   bat and that he will claim that Ward and Boyd "conspired" against him and fabricated their claims.

13   That Brainerd's recall of the incident leading to his arrest is entirely opposite of every other person

14   on scene speaks for itself; nevertheless, Brainerd's account is entirely irrelevant to this court's

15   determination that probable cause existed for his arrest.  The court's opinion in Peng v. Mei Chin

16   Penghu, 335 F.3d 970 (9th Cir. 2003) (cert. denied, 540 U.S. 1218, 124 S.Ct. 1506 (2004)), is

17   particularly instructive.  In Peng, the court addressed the issue of probable cause in a domestic

18   disturbance setting similar to that presented here.  Peng was arrested for robbery by Sheriff's Deputy

19   Gage based on allegations that Peng forcibly took certain documents from his sister.  Peng was taken

20   into custody, and thereafter was released when the District Attorney's office determined that there

21   was insufficient evidence to press charges.  Peng filed a civil rights suit against Deputy Gage, Peng's

22   sister and her son.  Peng alleged that his sister and her son made false statements to Gage that caused

23   his arrest.

24   The Ninth Circuit upheld the District Court's granting of summary judgment in favor of

25   Deputy Gage on the basis that probable cause existed for the arrest and that Deputy Gage was in any

26   event immune from suit based upon qualified immunity.  The court in Peng reiterated that police

27   officers responding to a domestic violence report have a duty to ensure the present and continued

28   safety and well being of the occupants of the residence where the alleged violence took place.  The

1  court further noted that where a victim alleges that force, or a threat of force, exists, it is "important

2  for officers to err on the side of safety for the victim in order to prevent further violence and allow

3  the parties to cool down." (Peng, supra, at 978, fn.6.)  Significantly, the court concluded that the

4  presence of "a factual dispute regarding a victim's complaint at the scene of an alleged domestic

5  disturbance does not defeat probable cause if: (1) the victim's statements are sufficiently definite to

6  establish that a crime has been committed; and (2) the victim's complaint is corroborated by either

7  the surrounding circumstances or other witnesses."  (Peng, supra, at 979.)

8       In the instant case, Boyd's statement that his roommate, Brainerd, had made a specific threat

9  to hit him in the head with a baseball bat, particularly given the circumstances of the heated

10  arguments, are indisputably sufficiently definite to establish the threat of violence proscribed by

11  Penal Code section 422.  Boyd's complaint was corroborated by Marcie Ward in statements to the

12  arresting officers.  Indeed, according to the arresting officers, Brainerd repeated his threat and

13  admitted his ability to obtain the bat.  Undoubtedly, for these reasons the magistrate, within 48 hours

14  of the arrest, determined that probable cause existed to hold Brainerd for the alleged crime.

15       The officers' arrest was based on the statements of Brainerd's victims as well as the officers'

16  own observations and interaction with Brainerd.  The victims statements to the officers were

17  definite: Brainerd threatened to physically harm his house-mate Bobby Boyd with a baseball bat.

18  Bobby Boyd and Marci Ward stated and demonstrated their fear that Brainerd would follow through

19  with his threats.

20  **C.    Qualified Immunity Extends to Shield Deputies Wristen and Devincenzi from Liability**

21       Qualified immunity protects "government officials . . . from liability for civil damages insofar

22  as their conduct does not violate any clearly established statutory or constitutional rights of which a

23  reasonable person would have known."  (Harlow v. Fitzgerald, 457 U.S. 800, 818 , 102 S.Ct. 2727

24  (1982).)  The rule of qualified immunity "provides ample protection for all but the plainly

25  incompetent or those who knowingly violate the law;" defendants can have a reasonable – albeit

26  mistaken – belief about the facts or about what the law requires in any given circumstance.  (Saucier

27  v. Katz, 533 U.S. 194, 202, 121 S.Ct. 2151 (2001), (quoting Malley v. Briggs, 475 U.S. 335, 341,

28  106 S.Ct. 1092 (1985).)  "Therefore, regardless of whether the constitutional violation occurred, the

1  [official] should prevail if the right asserted by the plaintiff was not 'clearly established' or the

2  [official] could have reasonably believed that his particular conduct was lawful."  (Romero v. Kitsap

3  County, 931 F.2d 624, 627 (9th Cir. 1991).)  "[T]he entitlement is an immunity from suit rather than a

4  mere defense to liability; . . .  It is effectively lost if a case is erroneously permitted to go to trial."

5  (Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806 (1985).)

6          In considering a claim of qualified immunity, a court must first determine whether the

7  plaintiff has alleged the deprivation of an actual constitutional right. "[T]he required first stop in the

8  qualified immunity analysis is to consider the materials submitted in support of, and in opposition to,

9  summary judgment, in order to decide whether a constitutional right would be violated if all the facts

10  are viewed in favor of the party opposing summary judgment."  (Jeffers v. Gomez, 267 F.3d 895,

11  909 (9th Cir. 2001).)  Then the court must determine whether that right was clearly established.

12  (Wilson v. Layne, 526 U.S. 603, 119 S.Ct. 1692 (1999).)  According to Saucier, the question the

13  court must determine in this motion is, taken in the light most favorable to Brainerd, do the facts

14  alleged show the deputies' conduct violated a constitutional right?  Saucier, supra, at page 201.  If no

15  constitutional right would have been violated were the allegations established, there is no necessity

16  for further inquiries concerning qualified immunity.  (Id.; see also Jackson v. City of Bremerton, 268

17  F.3d 646, 651 (9th Cir. 2001.)

18          In this case, the uncontested facts demonstrate the absence of any violation of Brainerd's

19  Fourth Amendment rights.  Even assuming the absence of probable cause, the deputies are

20  nevertheless immune from liability for Brainerd's claims.  If a constitutional violation can be made

21  out on the opposing party's submissions, "the second inquiry is whether the officer could

22  nevertheless have reasonably but mistakenly believed that his or her conduct did not violate a clearly

23  established constitutional right."  (Jackson, supra at page 651.; see also Jeffers, supra, at page 909.)

24  With respect to this second inquiry, the Supreme Court has "emphasized the broad discretion that

25  must be afforded to police officers who face tense situations, and the importance of granting

26  immunity even when the officers make mistakes."  (Jeffers, supra, at page 909; Saucier, supra, at

27  page 205.)

28          The Superior Court's determination that probable cause existed to hold Brainerd precludes

1  any argument that arrest was made without probable cause.  Even if a probable cause had not been

2  made, such as was the case in <u>Peng</u>, <u>supra</u>, the arresting officers would clearly be immune from suit

3  based upon qualified immunity.  It would not have been clear to reasonable officers in the position of

4  Wristen and Devincenzi that probable cause did not exist for the arrest.  In this inquiry, the central

5  issue is whether the deputies' actions were objectively reasonable in view of "the facts and

6  circumstances confronting them, without regard to their underlying intent or motivation." (<u>Graham</u>

7  <u>v. Conner</u>, 490 U.S. 386, 397, 109 S.Ct. 1865 (1989).  Any factual disputes Brainerd may attempt to

8  raise pertaining to the circumstances at the time of his arrest – including whether he ever actually

9  threatened to strike Boyd in the head with a bat, the availability of the bat to Brainerd, or any lack of

10  intent to carry out a threat once made – are inappropriate for consideration on the issue of qualified

11  immunity.  The analysis is of the facts and circumstances as perceived from the deputies' point of

12  view and an assessment of the reasonable objectivity of those circumstances.  (<u>Saucier</u>, at page 205.)

13       The deputies both observed the demeanor of Brainerd's roommates and their statements

14  regarding the threat made by Brainerd.  Both deputies observed the baseball bat in Brainerd's room.

15  Both deputies heard Brainerd reiterate his threat, stating he would not be "fucked with" and that he

16  would "do what he had to do."  The hostile environment with the threat of domestic violence made

17  by Brainerd was sufficient basis upon which the deputies determined probable cause existed for his

18  arrest.  As the court concluded in <u>Peng</u>, <u>supra</u>, even if the officer had been mistaken about the

19  existence of probable cause, his mistake was objectively reasonable, and he was entitled to qualified

20  immunity.  (<u>Peng</u>, <u>supra</u>, at page 980.)

21       Defendants Wristen and Brainerd are entitled, as a matter of law, to judgment on the basis of

22  qualified immunity.

23
24  **D.    The Uncontested Facts Demonstrate That a Determination of Probable Cause Was Timely Made**

25       A person held in custody must receive a fair and reliable determination of probable cause by

26  a judicial officer and this must be done promptly.  (<u>County of Riverside v. McLaughlin</u>, 500 U.S. 44,

27  111 S.Ct. 1661 (1991).)  The determination must be made as soon as reasonably feasible, but in no

28  / / / /

1    case more than 48 hours after the arrest.[3]    The Supreme Court has held that, where a jurisdiction has

2    established probable cause within forty-eight hours of arrest, that jurisdiction is immune from

3    systemic challenges.  (McLaughlin, at page 56.)

4          The Ninth Circuit specifically addressed the application of the time limitations prescribed by

5    McLaughlin, in a case factually similar to that presented here by Brainerd.  In United States v. Bueno

6    Vagus, 383 F.3d 1104 (9th Cir. 2004) (cert. denied 543 U.S. 429, 125 S.Ct. 1098 (2004)) the court

7    held:

8              If the government wishes to detain an arrested suspect pending further proceedings
             (rather than let the suspect go in the meantime), the Fourth Amendment adds an
9              additional requirement to the government's tasks.  In Gerstein v. Pugh, 420 U.S. 103,
             114, 95 S.Ct. 854 (1975) the Supreme Court held that 'the Fourth Amendment
10             requires a judicial determination of probable cause as a prerequisite to extended
             restraint of liberty following arrest."  When an arrest has been made subject to a
11             warrant, a judicial determination of determination of probable cause has already been
             made as a prerequisite to obtaining the arrest warrant.  In the case of warrantless
12             arrests, however, there has been no pre-arrest probable cause determination by a
             judicial officer.  In such cases, the Court has held that to detain the suspect pending
13             further proceedings, the government must obtain – within 48 hours of the arrest – a
             probable cause determination by a judicial officer.  (McLaughlin, citation omitted.)
14             [Fn 5. A delay of more than 48 hours is justified only by demonstration of 'the
             existence of a bona fine emergency or other extraordinary circumstance.'
15             McLaughlin, 500 U.S., at 57 111 S.Ct. 1661.]

16         Thus, even a delay beyond 48 hours may not constitute a Fourth Amendment violation where

17    sufficient justification for the delay is demonstrated.  (Id.)  A delay in determining probable cause

18    that lasts less than 48 hours can raise constitutional concerns only if the individual arrested can prove

19    *unreasonable delay*.  (McLaughlin, supra.)  Examples offered by the Supreme Court include delays

20    motivated by ill will against the arrested individual, such as delay for the purpose of gathering

21

22         [3] California Penal Code section 825(a) similarly requires, " (a) (1) Except as provided in paragraph (2),
23    the defendant shall in all cases be taken before the magistrate without unnecessary delay, and, in any event,
     within 48 hours after his or her arrest, excluding Sundays and holidays.  (2) When the 48 hours prescribed by
24    paragraph (1) expire at a time when the court in which the magistrate is sitting is not in session, that time shall
     be extended to include the duration of the next court session on the judicial day immediately following. If the
25    48-hour period expires at a time when the court in which the magistrate is sitting is in session, the arraignment
     may take place at any time during that session. However, when the defendant's arrest occurs on a Wednesday
26    after the conclusion of the day's court session, and if the Wednesday is not a court holiday, the defendant shall
     be taken before the magistrate not later than the following Friday, if the Friday is not a court holiday." California
27    Penal Code section 849(a) requires, "When an arrest is made without a warrant by a peace officer or private
     person, the person arrested, if not otherwise released, shall, without unnecessary delay, be taken before the
28    nearest or most accessible magistrate in the county in which the offense is triable, and a complaint stating the
     charge against the arrested person shall be laid before such magistrate."

1  additional evidence to justify the arrest.  Id., at page 57.

2      The probable cause determination here complies with the procedural requirements imposed

3  by McLaughlin.  Distinguishing the time and procedural limitations imposed on determination of

4  probable cause with arraignment proceedings, the Ninth Circuit in United States v. Van Poyck, 77

5  F.3d 285 (9th Cir. 1996) (cert. denied 519 U.S. 912, 117 S.Ct. 276 (1996)) noted:

6      This [unavailability of a magistrate for arraignment] distinguishes this situation from
       the determination of probable cause which must be made within 48 hours . . . of a
7      warrantless arrest in [McLaughlin].  **Such probable cause determinations can be
       made solely on the basis of written affidavits and do not require the services of
8      any personnel beyond the judicial officer**.  (Van Poyck, supra, at footnote 6.
       Emphasis added.)

9

10     In this case, the arresting officer prepared and presented a declaration for determination of

11 probable cause the night Brainerd was booked into the Lake County Jail.  Within 48 hours of this

12 declaration, a judicial officer determined probable cause existed for the arrest and communicated this

13 determination to the Lake County Jail.  There was no delay, reasonable or otherwise, in obtaining

14 this determination.

15     Brainerd's arrest was reviewed by the Lake County District Attorney.  Ultimately, on

16 Monday, May 23, 2005, the Lake County Jail received notification that the District Attorney

17 determined not to pursue formal charges against Brainerd; rather, the District Attorney determined

18 that the interests of justice were served by Brainerd's arrest.  Therefore, Brainerd was not arraigned

19 prior to his release from detention.  Following notification from the District Attorney, Brainerd was

20 released within a reasonable time, at approximately 10:30 a.m. May 23, 2005.

21     The probable cause determination occurred well within the requisite time limitations and

22 defendants are entitled to summary judgment on this claim.

23     **E.    The Uncontested Facts Demonstrate That Defendants Were Not Deliberately
              Indifferent to Any Serious Medical Need of Brainerd**

24     The right of a pretrial detainee to receive adequate medical care while in custody derives

25 from the due process clause of the Fourteenth Amendment rather than the Eighth Amendment

26 protections against cruel and unusual punishment.  (Gibson v. County of Washoe, 290 F.3d 1175,

27 1187 (9th Cir. 2002).)  "The due process clause imposes, at a minimum, the duty the Eighth

28 Amendment imposes: 'persons in custody ha[ve] the established right to not have officials remain

1   deliberately indifferent to their serious medical needs'." (Id., quoting Carnell v. Grimm, 74 F.3d 977,

2   979 (9th Cir. 1996).)  Therefore, while the claims of pretrial detainees derive from the Fourteenth

3   Amendment due process clause, the Eighth Amendment "serves as the benchmark for evaluating

4   these claims." (Carnell, supra, at page 877.)  "A defendant is liable for denying medical care only if

5   he 'knows of and disregards an excessive risk to inmate health and safety'." (Lolli v. County of

6   Orange, 351 F.3d 410, 418 (9th Cir. 2003) quoting Gibson, supra, at page 1187.)  Brainerd has the

7   burden to establish that he was (1) "confined under conditions posing a risk of objectively,

8   sufficiently serious harm," and (2) "that the officials had a sufficiently culpable state of mind in

9   denying the proper medical care." (Clement v. Gomez, 298 F.3d 898, 904 (9th Cir. 2002).)  Thus, the

10  claim requires Brainerd to establish the objective component of serious medical need[4] and the

11  subjective component, to "show that the officials had a culpable state of mind which is 'deliberate

12  indifference' to a substantial risk of serious harm." (Id.)

13      Mere negligence does not suffice to establish a constitutional violation.  "Thus, a complaint

14  that a physician has been negligent in diagnosing or treating a medical condition does not state a

15  valid claim of medical mistreatment under the Eighth Amendment.  Medical malpractice does not

16  become a constitutional violation merely because the victim is [in custody]." (Estelle v. Gamble,

17  429 U.S. 97, 106, 97 S.Ct. 285 (1976).)

18      "[A] person is liable for denying a prisoner needed medical care only if the person 'knows of

19  and disregards an extensive risk to inmate health and safety'. (Citation omitted.)  In order to know of

20  the excessive risk, it is not enough that the person merely 'be aware of facts from which the inference

21  would be drawn that a substantial risk off serious harm exists, [  ] he must also draw that inference.'

22  (Citation omitted)." (Gibson, supra, at pages 1187-1188.)

23      To impose liability on an individual, plaintiff bears the burden to make an affirmative

24  showing that defendant knew that Brainerd faced a substantial risk of serious harm and that

25  defendants disregarded that risk by failing to take reasonable steps to abate it. (Farmer v. Brennan,

26  511 U.S. 825, 837, 114 S.Ct. 1970 (1994).)  This may be satisfied by showing (1) a purposeful act or

27  _____

28      [4] It is not disputed for purposes of this motion that plaintiff's diabetic condition is of the nature of a "serious medical need."

PROPOSED ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. C 07 2663 EDL

H:\MAJ.cases\Brainerd v. Lake County\Pleadings\MSJ\MSJ - Proposed Order.wpd

1    failure to respond to a possible medical need and (2) harm caused as a result of the indifference.  The

2    Farmer court characterized the "state of mind" must be "more blameworthy than negligence." (Id., at

3    835.)  The inquiry for this substantive component of "deliberate indifference" requires an

4    assessment of the prison officials' state of mind.  (Wilson v. Seiter, 501 U.S. 294, 299, 111 S.Ct.

5    2321 (1991).)  The Farmer court expressed the standard for assessment:

6        We reject prisoner's invitation to adopt and objective test for deliberate indifference.
         We hold instead that a prison official cannot be found liable under the Eighth
7        Amendment . . . unless the official knows of and disregards an excessive risk to
         inmate health or safety; the official must both be aware of the facts from which the
8        inference could be drawn . . . and he must also draw the inference.

9        In order for liability for deliberate indifference to attach to a municipality, the plaintiff must

10   produce evidence demonstrating constructive notice that it needs to "remedy its omissions in order to

11   avoid violations of constitutional rights". (Gibson, supra, 290 F.3d at page 1187, fn. 8, citing

12   Farmer, supra, 511 U.S. at page 841 and City of Canton v. Harris, 489 U.S. 378, 388, n. 8, 109 U.S.

13   1197 (1989).)

14       Indifference "may appear when prison officials deny, delay or intentionally interfere with

15   medical treatment, or it may be shown by the way in which prison physicians provide medical care".

16   (Hutchinson v, United States, 838 F.2d 390, 392 (9th Cir. 1988).)  However, "[m]ere differences of

17   opinion between a prisoner and the prison medical staff do not and cannot support a claim for

18   "deliberate indifference."  (Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996) cert denied 519

19   U.S. 1029, 117 S.Ct. 584 (1996); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989); Franklin v.

20   Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).)

21       Brainerd bases his claim of "deliberate indifference" on the allegation that defendants, being

22   informed of plaintiff's medical condition, failed to respond.[5]  The uncontested facts demonstrate just

23   the opposite is true.  Defendants took the initiative in the booking process to ascertain the state of

24

25       [5]  Plaintiff alleges in his complaint: "During [the period of plaintiff's detention] plaintiff began
26   experiencing diabetic seizures as a result of the uncontrolled diabetes, including medical complications and
     symptoms resulting in significant harm to plaintiff's health and safety. Plaintiff's conditions became so pervasive
27   and apparent that another inmate who was familiar with diabetic symptoms provided plaintiff with two pieces
     of small candy to control plaintiff's condition.  Plaintiff and others informed defendants and their detention
28   medical staff that plaintiff needed emergency medical intervention, but defendants failed to take any reasonable
     measures to treat plaintiff's medical condition."  Complaint at paragraph 17.

PROPOSED ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. C 07 2663 EDL

H:\MAJ.cases\Brainerd v. Lake County\Pleadings\MSJ\MSJ - Proposed Order.wpd

1   Brainerd's health and immediately summoned medical services to evaluate, monitor and treat his

2   diabetic condition throughout the period of his detention.

3        The claims against the defendants County of Lake and Lake County Sheriff's Department are

4   without merit.  Medical services for the jail facility are provided by independent contractor CFMG.

5   Upon discovery of Brainerd's diabetic condition, defendants summoned CFMG and advised CFMG

6   of his condition.  Thereafter, CFMG provided monitoring and treatment for Brainerd.  No facts exist

7   upon which Brainerd can demonstrate the requisite culpable state of mind against these defendants.

8        Defendants were informed by plaintiff at the time of plaintiff's booking that he had Type I

9   diabetes.  Defendants further obtained from Brainerd a list of the prescription medications Brainerd

10  was required to take.  This information was obtained by the booking officers in compliance with the

11  booking policies and procedures in effect as of May 19, 2005.  Pursuant to these policies and

12  procedures, the CFMG medical staff was notified of this information at approximately 6:28 p.m. on

13  May 19, 2005 - or within the hour after plaintiff was brought into the Lake County Jail after his

14  arrest.

15       Defendants County of Lake and Lake County Sheriff's Department may only be held liable

16  for deliberate indifference when plaintiff demonstrates that these defendants knowingly failed to

17  respond to plaintiff's requests for help.  (Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285 (1976).)

18  The uncontested facts demonstrate that defendants themselves did not withhold medical treatment

19  from the plaintiff, neither withheld nor administered medications to the plaintiff, promptly notified

20  the contracted medical services provided, and did not interfere with contracted medical services.

21  CFMG immediately evaluated Brainerd's condition, monitored his blood sugar levels at regular

22  intervals throughout his detention, obtained medication records from Brainerd's healthcare providers

23  and administered medications.

24

        **F.      The Uncontested Facts Demonstrate There Exists No Basis for Municipal
25              Liability**

26       Brainerd alleges municipal liability as to each cause of action; however, Brainerd fails to

27  / / / /

28  / / / /

H:\MAJ.cases\Brainerd v. Lake County\Pleadings\MSJ\MSJ - Proposed Order.wpd

1   identify any specific basis upon which he claims municipal liability as to any cause of action.[6]

2       "A municipality may nor be sued under Section 1983 solely because an injury was inflicted

3   by its employees or agents . . . Instead it is only when execution of a government's policy or custom

4   inflicts the injury that the municipality as an entity is responsible." (Monell v. Dept. of Social

5   Services, 436 U.S. 658, 690, 98 S.Ct. 2018 (1978).)  Counties are not liable for deprivations caused

6   by their employees.  (Id.)  Counties are subject to liability where "action pursuant to official

7   municipal policy of some nature cause[s] a constitutional tort."  (Id.)  Liability of the municipality

8   must rest on its own actions.

9       Such "official . . . policy" may be established by either of two methods.  One method is to

10  demonstrate that the violation "was caused by an existing, unconstitutional municipal policy, which

11  policy can be attributed to a municipal policy maker."  (City of Oklahoma City v. Tuttle, 471 U.S.

12  808, 823-824, 105 S.Ct. 2427 (1985).)  The practice must consist of more than "random acts or

13  isolated events" and must instead be the result of "permanent well settled practice."  (Thompson v.

14  City of Los Angeles, 885 F.2d 1439, 1443-1444 (9th Cir. 1988).)  The second method is to

15  demonstrate that the violation, if random or isolated, was undertaken or ratified by "the city

16  employee who had the final decision making authority on the issue in question."  (Los Angeles

17  Protective League v. Gates, 907 F.2d 879, 889 (9th Cir. 1990), citing City of St. Louis v. Praprotnik,

18  485 U.S. 112, 108 S.Ct. 915 (1988).) Absent the intervention of a final policy maker, a single

19  incident of unconstitutional action is insufficient to support municipal liability.  Brainerd's complaint

20  does not distinguish which method he intends to pursue in this action.

21      Brainerd must demonstrate not only the existence of a policy, but causation.  Only where a

22  municipal policy is deemed the "moving force" behind the violation is a sufficient causal

23  relationship established.  (Chew v. Gates, 27 F.3d 1432, 1444 (1994), citing Monell, supra, at page

24  690-691.)  Plaintiff bears the burden of demonstrating a ***direct causal link*** between departmental

25  policy or custom and the alleged deprivation.  (City of Canton v. Harris, supra, 489 U.S. at page

26  _____

27      [6] Brainerd alleges only that Wristen and Devincenzi were involved in his arrest.  Brainerd identifies no
    other individual defendants, including employees, agents, or final policy makers he claims participated in the

28  wrongful conduct he alleges.  Allegations as against the County of Lake and the Lake County Sheriff's Office
    are redundant and are considered jointly here.

1  385.)

2        Brainerd has not and cannot establish any basis for liability against Lake County or its

3  Sheriff's Department.  Brainerd neither presents nor suggests the existence of any evidence that the

4  claimed violations were committed pursuant to formal policy or a "longstanding practice or custom

5  which constitutes the standard operating procedure" of the County or the Sheriff's Department.  (Jett

6  v. Dallas Independent School District, 491 U.S. 701, 737, 109 S.Ct. 2702 (1989).)  Brainerd does not

7  contend that individuals who committed alleged violations were officials with final decision-making

8  authority.  (Pembauer v. City of Cincinnati, 475 U.S. 469, 480-481, 106 S.Ct. 1292 (1986).)  Neither

9  does Brainerd allege or present evidence supporting a contention that an official with final decision-

10  making authority ratified a subordinate's action and its basis.  (City of St. Louis v. Praprotnik, supra,

11  at page 127.)

12

13        **G.        The Uncontested Facts Demonstrate Neither Deputy Wristen Nor Devincenzi
                       Are Liable for the Allegations of Brainerd's Third and Fourth Causes of Action**

14        Subsequent to Brainerd's arrest, pursuant to Lake County policy and procedures, Wristen

15  prepared a Declaration for Probable Cause including details concerning the circumstances of the

16  arrest.  Neither Wristen nor Devincenzi otherwise participated in the probable cause determination or

17  the timing of that determination.  Brainerd has not and cannot present any facts reflecting a duty on

18  the part of either deputy to ensure a timely probable cause determination was made.  Brainerd has not

19  and cannot present any facts reflecting the either deputy interfered with or otherwise delayed the

20  probable cause determination.  No facts are alleged nor exist upon which Brainerd may maintain this

21  claim against these individual defendants.  As such, these defendants are entitled to summary

22  judgment against Brainerd on the third cause of action.

23        The uncontested facts demonstrate that neither Wristen nor Devincenzi observed any serious

24  medical condition for which Brainerd required medical treatment.  Wristen and Devincenzi were the

25  arresting officers.  There is no allegation - neither do any facts support such an allegation – that

26  either Wristen or Devincenzi observed Brainerd during his detention or otherwise had any duty to

27  ensure medical treatment was provided to Brainerd.

28        No facts are alleged nor exist upon which Brainerd may maintain this claim against these

1    individual defendants.  As such, these defendants are entitled to summary judgment against Brainerd

2    on the fourth cause of action.

3    **IV.      DETERMINATION**

4           For the foregoing reasons, the Court GRANTS the motion for summary judgment of

5    defendants Lake County, Lake County Sheriff's Office, Matthew Wristen and Emil Devincenzi and

6    enters judgment in their favor and against plaintiff.

7     IT IS SO ORDERED.

8

9    Dated: _____          _____

10                                                     ELIZABETH D. LAPORTE
                                                       United States Magistrate Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28