David M. Poore, SBN 192541
KAHN BROWN & POORE LLP
755 Baywood Drive, Suite 185
Petaluma, California 94954
Telephone:    (707) 763-7100
Facsimile:    (707) 763-7180
dpoore@kahnbrownlaw.com


Attorneys for Plaintiff
MICHAEL BRAINERD


# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL BRAINERD,<br><br>       Plaintiff,<br><br>v.<br><br>COUNTY OF LAKE; LAKE COUNTY SHERIFF'S OFFICE; and DOES 1 through 50, inclusive,<br><br>       Defendants. | Case No.  C 07 2663 EDL<br><br>**PLAINTIFF MICHAEL BRAINERD'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES**<br>**[F.R.C.P. 56]**<br><br>**Date:    July 22, 2008**<br>**Time:    9:00 a.m.**<br>**Courtroom E, 15th Floor**<br>**Hon. Elizabeth D. Laporte** |

1

**TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................. 1

I. STATEMENT OF THE CASE .............................................................................................. 1

II. STATEMENT OF FACTS..................................................................................................... 1

A.   The Disputed Facts in the Arresting Officer's Declarations. ................................. 1

B.   The Civil Property Dispute Involving Plaintiff and His Roommates. ................... 3

C.   The Warrant-Less Arrest on May 19, 2005. ......................................................... 4

D.   The Inadequate Medical Treatment During Confinement. .................................... 7

E.   The Lack of a Probable Cause Hearing. ................................................................ 7

F.   The Continued Confinement to Assist a Private Litigant to Serve a Civil Temporary Restraining Order. ............................................................................................ 9

G.   The County's Custom, Policy, and Practice with Respect to Probable Cause Hearings and Warrantless Arrests of Domestic Violence Suspects. ....................................... 10

III.   LEGAL ARGUMENT .................................................................................................. 10

A.   The Disputed Facts Demonstrate that the Arrest was Unlawful. ......................... 10

1. Defendants Conducted an Unlawful Search under the Fourth Amendment. ................. 11

2. Defendants Engaged in Custodial Interrogation without Advising Plaintiff of his Constitutional Rights. ............................................................................................. 12

3. Defendants' Unlawful Arrest. .............................................................................. 12

B.   The Undisputed Facts Show that the Alleged Probable Cause Determination was Not Prompt or Timely. ............................................................................................. 14

1. Plaintiff was Not Brought Before a Neutral Magistrate.................................................. 14

2. There is No Evidence of Any Probable Cause Hearing. .................................................. 14

3. The Arresting Officer's Declaration of Probable Cause Contained False Information, and Rendered Any Probable Cause Determination Invalid on its Face. ........................ 15

4. A Telephonic Determination of Probable Cause After 42 Hours of Confinement Without Any Explanation of Delay is Unreasonable under the Fourth Amendment.... 15

C.   The Continued Seizure of Plaintiff to Assist a Civil Litigant to Serve a Civil Temporary Restraining Order Violates the Fourth Amendment. ........................................................... 16

D.   Defendants Were Deliberately Indifferent to Plaintiff's Medical Needs when they Provided the Wrong Medication and Diet with Actual Knowledge of the Consequences. 16

E.   The Arresting Officers are Liable for the Third and Fourth Causes of Action.................. 17

F.   The Arresting Officers are Not Entitled to Qualified Immunity......................................... 18

G.   There is Sufficient Support for the Monell Liability Claim............................................... 18

IV.    CONCLUSION ..................................................................................................................... 19

1

## **TABLE OF AUTHORITIES**

2

**Cases**

3

*Allen v. City of Portland,*
    73 F.3d 232, 236 (9th Cir. 1995) ..................................................................................... 13

4

5

*Austin v. Hamilton,*
    945 F.2d 1155, 1162-1163 (10th Cir. 1991)................................................................. 14, 15

6

*Bernard v. City of Palo Alto,*
    699 F.2d 1023 (9th Cir. 1983)......................................................................................... 14

7

8

*Chavez v. Martinez,*
    123 S.Ct. 1994 (2003) ..................................................................................................... 12

9

*County of Riverside v. McLaughlin,*
    500 U.S. 44, 53 (1991) ............................................................................................. 14, 18

10

11

*Devenpeck v. Alford,*
    543 U.S. 146 (2004) ........................................................................................................ 16

12

13

*Dickerson v. United States,*
    530 U.S. 428 (2000) ........................................................................................................ 12

14

*Farmer v. Brennan,*
    511 U.S. 825 (1994) ........................................................................................................ 16

15

16

*Florida v. Jimeno,*
    500 U.S. 248 (1991) ........................................................................................................ 11

17

18

*Gardenhire v. Schubert,*
    205 F.3d 303, 315 (6th Cir. 2000) ................................................................................... 13

19

*Georgia v. Randolph,*
    126 S.Ct. 1515, 1519 (2006) .......................................................................................... 11

20

21

*Gibson v. County of Washoe,*
    290 F.3d 1175 (9th Cir. 2002)......................................................................................... 16

22

23

*Gil v. Reed,*
    381 F.3d 649, 659 (7th Cir. 2004) ................................................................................... 17

24

*Halvorsen v. Baird,*
    146 F.3d 680, 688-690 (9th Cir. 1998)............................................................................ 14

25

26

*Hedges v. Musco,*
    204 F.3d 109, 121 (3d Cir. 2000) ................................................................................... 17

27

28

-iii-

*Hutchinson v. United States,*
    838 F.2d 390 (9th Cir. 1988) ......................................................................................... 17

*Illinois v. Rodriquez,*
    497 U.S. 177 (1990) ......................................................................................................... 11

*Jackson v. Sauls,*
    206 F.3d 1156, 1168 (11th Cir. 2000) ........................................................................... 17

*Jones v. City of Santa Monica,*
    382 F.3d 1052 (9th Cir. 2004) ....................................................................................... 14

*Katz v. United States,*
    389 U.S. 347 (1967) ......................................................................................................... 11

*LaLonde v. County of Riverside,*
    204 F.3d 947 (9th Cir. 2004) ......................................................................................... 18

*Llaguno v. Mingey,*
    739 F.2d 1186 (7th Cir. 1984) ....................................................................................... 14

*Maryland v. Pringle,*
    540 U.S. 366 (2003) ......................................................................................................... 12

*Miranda v. Arizona,*
    384 U.S. 436 (1966) ......................................................................................................... 12

*Monell v. Department of Social Services,*
    436 U.S. 658 (1978) ......................................................................................................... 18

*Peng v. Mei Chin Penghu,*
    335 F.3d 970 (9th Cir. 2003) ......................................................................................... 13

*People v. Brown,*
    20 Cal.App.4[th] 1251 (1993) ........................................................................................... 13

*United States v. Matlock,*
    415 U.S. 164 (1974) ......................................................................................................... 11

*Wilson v. Layne,*
    526 U.S. 603 (1999) ......................................................................................................... 11

**Statutes**

U.S. Constitution, Fifth Amendment ..................................................................................... 10, 12

U.S. Constitution, Fourteenth Amendment............................................................................. 10, 12

U.S. Constitution, Fourth Amendment ................................................................................... 10, 11

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2    **I.    STATEMENT OF THE CASE**

3    This case is a civil rights action asserting violations of the Fourth, Fifth, and Fourteenth

4    Amendments to the United States Constitution.  In particular, plaintiff alleges that defendants

5    unlawfully arrested plaintiff for engaging in felony "terrorist acts" without any reasonable

6    investigation or probable cause.  Moreover, plaintiff alleges that he was improperly searched,

7    seized, and incarcerated in the Lake County Jail for a period of approximately 90 hours without

8    being brought before a neutral magistrate, and without any reasonable judicial review or probable

9    cause determination.  During this period of time, plaintiff suffered from extremely brittle form of

10   Type I Diabetes that required a specific medication regime, and defendants recklessly provided

11   plaintiff with the wrong medication resulting in severe medical complications, including seizure-

12   like activities.        Defendants later admitted that the "terrorist" charges against plaintiff were

13   baseless, and plaintiff was never formally charged with any crime.  As a result of defendants'

14   actions, plaintiff suffered significant damages, including the loss of his long-term position as a

15   government worker with the City of Ukiah.

16

17   **II. STATEMENT OF FACTS**

18   **A.    The Disputed Facts in the Arresting Officer's Declarations.**

19   Defendants rely solely upon the declarations of the two defendants/arresting officers to

20   claim that there is no triable issue of fact with respect to the arrest and subsequent probable cause

21   declaration.  However, as set forth immediately below, there are several material facts that are

22   disputed in the declarations of the arresting officers.  In those declarations (which are virtually

23   identical), the defendants claim that the following facts are undisputed:  (1) "upon questioning

24   Brainerd admitted that he made the threat against Bobby Boyd but that he did not mean it"; (2)

25   "Brainerd stated that he felt he was being 'fucked with' by Boyd and Ward"; (3) "Brainerd

26   admitted that he had a baseball bat in his room"; (4) that the officers "actually observed the

27   baseball bat in Brainerd's room"; (5) plaintiff allegedly stated that he "was not going to be

28   'fucked with' and that he would do what he had to do" with the baseball bat; (6) plaintiff had

-1-

1  allegedly "consumed a couple of beers after work" on the date of the arrest; and (7) once plaintiff

2  was transported to the jail, he admitted that he "was sorry he had made the treat and that [he

3  would never hurt anyone". (Devincenzi Decl., ¶¶ 4, 5, 9; Wristen Decl., ¶¶ 4, 5, 8, 9.) Plaintiff

4  disputes these facts in his sworn declaration, and, as a result, there is a triable issue of fact that

5  precludes summary judgment. (Brainerd Declaration in support of opposition to defendants'

6  Motion for Summary Judgment ("Brainerd Decl."), ¶¶ 2-12).

7          In particular, at no time did plaintiff ever admit to making "the threat" against Bobby

8  Boyd. Moreover, at no time did plaintiff ever admit to making any such threat with the caveat

9  that he "did not mean it". In fact, at no time did plaintiff make any such "terrorist threat" against

10 any of his roommates on May 19, 2005. (Brainerd Decl., ¶ 5) Moreover, at no time did plaintiff

11 advise the officers that he was being "fucked with" by Boyd or Ward. (Brainerd Decl., ¶ 6).

12 Plaintiff did not admit that he had "a baseball bat" in his room, and, in fact, there was no baseball

13 bat in plaintiff's room on May 19, 2005. (Brainerd Decl., ¶ 7).

14          Moreover, at no time could the officers have observed any baseball bat in plaintiff's room

15 because there was no baseball bat in his room on May 19, 2005. (Brainerd Decl., ¶ 8)

16 Additionally, the officers did not take any such baseball bat into evidence, or take any

17 photographs or any other images to establish there was a baseball bat in the room. *Id.*

18 Furthermore, at no time did plaintiff ever state that he would "do what he had to do" in response

19 to any questioning, including any such comments in this same context about being "fucked with"

20 by his roommates. (Brainerd Decl., ¶ 9). These facts are simply not true.

21          Plaintiff also did not consume "a couple of beers" after work. Plaintiff had one (1) beer

22 after work more than two hours before this incident. At the time, one beer was plaintiff's limit of

23 consumption due to the effect alcohol has on his medical condition. (Brainerd Decl., ¶ 10).

24          Once plaintiff was transported to the jail, he never admitted that he "was sorry" for

25 making "the threat", and never stated that he "would never hurt anyone" in such a context.

26 (Brainerd Decl., ¶ 11). Instead, plaintiff has consistently denied the allegations surrounding his

27 arrest under Penal Code Section 422 – Terrorist Threats. On May 19, 2005 (or any other date),

28

1  plaintiff never made any such "terrorist threats" to his roommates, and never admitted to making

2  any criminal threats whatsoever. (Brainerd Decl., ¶ 12).

3  **B.      The Civil Property Dispute Involving Plaintiff and His Roommates.**

4          Instead, this entire dispute surrounded a civil matter involving an investment property

5  between three roommates. In 2003, plaintiff purchased a house with his two former roommates,

6  Marci Ward and Bobby Boyd, located at 5269 Blue Lakes Road in Upper Lakes, California.

7  They purchased the house as both an investment property and place to reside together. The house

8  had three separate, private bedrooms. Although Ms. Ward had limited financial means, all three

9  agreed that ownership in the house would be "one-third" for each roommate. Prior to the

10  purchased of the house, plaintiff had a long-term intimate relationship with Ms. Ward. (Brainerd

11  Decl., ¶ 13).

12          Prior to moving into the home plaintiff purchased with Marci Ward and Bobby Boyd,

13  plaintiff's romantic relationship with Ms. Ward came to an end. Although plaintiff was

14  disappointed that the relationship had come to an end, he accepted the situation, and lived in a

15  separate private room in the residence. (Brainerd Decl., ¶ 14).

16          Over the course of the next several months, the relationship between the roommates over

17  the ownership of the house deteriorated. After numerous discussions regarding the status of the

18  house, Ms. Ward and Mr. Boyd advised plaintiff that they wanted to purchase his share of the

19  house. As a result, on or about May 17, 2005, plaintiff's roommates offered to "buy-out"

20  plaintiff's share of the house for approximately $10,000.00 to $11,000.00; much less than

21  plaintiff's initial investment and the amount of mortgage payments and expenses that he invested

22  in the house. Immediately after this offer, plaintiff consulted with a real estate broker to

23  determine if the amount offered was reasonable under the circumstances. The broker advised

24  plaintiff that the amount offered by his roommates was too low in light of the real-estate market

25  in Lake County, and that a more reasonable amount would be approximately $27,000.00.

26  (Brainerd Decl., ¶ 15).

27          On May 18, 2005, the next day, plaintiff informed his roommates that the broker had

28  assessed plaintiff's share of the house at approximately $27,000.00, and that he was willing to

-3-

1    accept $26,000.00 as a fair value to sell his one-third ownership interest. When plaintiff's
2    roommates heard this counter-offer, they were furious. They told plaintiff that they did not have
3    the funds for such a purchase. Plaintiff then advised his roommates that the three had no choice
4    but to select a force-sale of the house so that plaintiff could be adequately compensated for his
5    investment. Mr. Boyd and Ms. Ward became even more furious at plaintiff, and made several
6    condescending remarks. The roommates became even more furious. (Brainerd Decl., ¶ 16).

7         Plaintiff did not know that, after this argument, Ms. Ward had gone down to defendant
8    County of Lake's Victim-Witness office to seek an immediate "move-out" order against plaintiff
9    for allegations of "verbal abuse." In fact, plaintiff committed no such acts of "verbal abuse", and
10   this attempt to obtain a "move-out" order was nothing more than a sham to deprive plaintiff of
11   full value for his investment. (Brainerd Decl., ¶ 17).

12   **C.    The Warrant-Less Arrest on May 19, 2005.**

13        In the afternoon of May 19, 2005, plaintiff returned home from his job at the City of
14   Ukiah. He had consumed one (1) beer after work, and was not impaired in any manner. When
15   plaintiff arrived at the house, Ms. Ward was in her room. Plaintiff did not disturb her, and went
16   directly into his room. An hour later, at approximately 4:30 p.m., Mr. Boyd returned home from
17   his job. When plaintiff walked out of his room to go to the kitchen, Ms. Ward and Mr. Boyd
18   approached plaintiff to discuss the "situation" regarding the house. Plaintiff again advised them
19   that he would not accept any offer less than full reasonable value for his investment. (Brainerd
20   Decl., ¶ 18).

21        In response, Mr. Boyd became belligerent and angry towards plaintiff, and attempted to
22   coerce plaintiff into accepting less than full value for his share of the house. In particular, Mr.
23   Boyd advised plaintiff that he "can make it appear as though he had not made any payments" on
24   the house. Mr. Boyd told plaintiff that he could destroy "the paper trail" to make it appear as
25   though plaintiff deserved less on the house. Plaintiff immediately advised Mr. Boyd that he was
26   "not being reasonable", and that we would have to resort to the legal process for a force-sale. Mr.
27   Boyd then clenched his fists together as though he was going to hit plaintiff, and stated words to
28   the effect of "come on" and "try to hit me." Plaintiff immediately replied that "this is not worth

-4-

1    it", and went back into his room for the remainder of the evening. At that point, plaintiff believed

2    that the argument was over. (Brainerd Decl., ¶ 19).

3         At no point during this argument did plaintiff ever threaten to hit anyone with a "baseball

4    bat" or make any "terrorist threats" of any kind. In fact, there was no baseball bat in the house.

5    (Brainerd Decl., ¶ 20).

6         Approximately 40 to 45 minutes later, two Sheriff Deputies (the two individual defendants

7    in this case) from defendant County of Lake entered plaintiff's private room. At this time,

8    plaintiff was sitting at the desk in his room alone. He did not have a baseball bat or any other

9    weapon inside the room, or within his reach. The officers did not have a warrant to enter

10   plaintiff's private room, and plaintiff never provided any consent for them to come inside his

11   room. Despite the lack of a warrant or consent, the two defendant-officers entered plaintiff's

12   room without any permission. One of the officers stood over plaintiff, and the other officer

13   blocked the doorway. Plaintiff reasonably believed that he was not free to leave, and could not

14   simply get up and walk out the door. (Brainerd Decl., ¶ 21). During this time, the defendants did

15   not advise plaintiff of his *Miranda* rights, including a right to remain silent or right to counsel

16   prior to any questioning. (Brainerd Decl., ¶ 22).

17        Despite the lack of disclosure of his constitutional rights, the defendants began

18   interrogating plaintiff in his room. The younger-appearing Deputy asked plaintiff if he "had a

19   baseball bat in the house." Plaintiff immediately replied, "No." The Deputy then advised

20   plaintiff that he was being "handcuffed" and "verbally charged" with an undisclosed crime.

21   When plaintiff asked why he was "being taken away", the Deputy informed plaintiff that he was

22   being charged with a "terrorist threat." However, the defendants still did not advise plaintiff of

23   any of his *Miranda* rights to remain silent or to counsel. When plaintiff heard this information, he

24   was visibly shocked. Plaintiff informed the officer that this was "ridiculous" and that it was

25   nothing more than an civil argument with his roommates over their continued attempts to

26   impermissibly force plaintiff out of the house. Plaintiff offered to give a sworn statement to this

27   affect. The Deputy appeared disinterested, and, instead of conducting any reasonable

28

1   investigation, immediately arrested plaintiff without a warrant and charged plaintiff with being a

2   "felony terrorist." (Brainerd Decl., ¶ 23).

3       Once the defendant-officers placed plaintiff into handcuffs, they again asked plaintiff if he

4   owned a "baseball bat" that was stored in his room. Plaintiff again advised the officers that there

5   was no baseball bat in his room. The defendants then escorted plaintiff out of the house, and

6   mentioned that they need to talk to his roommates. (Brainerd Decl., ¶ 24).

7       At no point in time did plaintiff have a baseball bat "in [his] room" or "within [his]

8   reach." Moreover, although the defendant-officers apparently charged plaintiff with making

9   felony "terrorist threats" with a baseball bat, the defendants never conducted a search for the

10  baseball bat in plaintiff's room; never collected any baseball bat into evidence; never took any

11  pictures or video-footage of the alleged baseball bat; never located any baseball bat inside

12  plaintiff's room; and made no efforts to locate and/or collect this mysterious baseball bat

13  anywhere inside the house. Additionally, each time that plaintiff attempted to explain that the

14  charges were baseless and nothing more than a civil matter involving a financial dispute amongst

15  the three roommates, the defendant-officers appeared disinterested, cut plaintiff off in mid-

16  sentence, and openly refused to adequately investigate the circumstances surrounding plaintiff's

17  roommates' obvious attempts to force plaintiff to "move-out" of the house. (Brainerd Decl., ¶ 25).

18      The defendant-officers then placed plaintiff in the back of their patrol car which was

19  parked adjacent to plaintiff's house. The entire situation was extremely humiliating to plaintiff.

20  Prior to being placed in the patrol car, plaintiff advised the officers that he had an extremely

21  serious and brittle case of Type I Diabetes that required a very specific form of medication

22  treatment, including the use of Lantis, a necessary diabetic drug to prevent seizure activities

23  and/or a diabetic coma. Plaintiff further advised the officers that stressful situations significantly

24  aggravate his Diabetic medical condition. As a result, plaintiff asked the officers that he be

25  allowed to take this medication with him, or, in the alternative, that they take custody of his

26  medication so that it can be made available to plaintiff. They refused. As a result, plaintiff's

27  blood sugar level increased to a count of 234 by the time plaintiff was processed in the jail.

28

1  Plaintiff's normal controlled blood sugar level with Lantis was in the range of 90 to 120.

2  (Brainerd Decl., ¶ 26).

3  **D.      The Inadequate Medical Treatment During Confinement.**

4         Once plaintiff was processed into the defendant County of Lake jail, plaintiff advised the

5  staff that he had a strict-diet for his Type I Diabetes, and that he required the use of Lantis to

6  control his medical condition. Plaintiff informed the jail staff that his blood sugar level would

7  sky-rocket to extremely dangerous levels if the Lantis medication regime was not followed.

8  (Brainerd Decl., ¶ 27).

9         Despite plaintiff's instructions, the jail staff provided plaintiff the wrong medications on

10  multiple occasions during his incarceration, and failed to provide plaintiff with the dietary

11  requirements for his medical condition. Instead, throughout his incarceration, plaintiff was

12  provided with low-doses of "regular insulin". As a result, plaintiff's Diabetic condition became

13  uncontrollable, and his blood sugar levels reached into the extremely dangerous range of 465 to

14  538. (Brainerd Decl., ¶ 28; Ex. A [Def 37], D [Def 7], Esberg Decl.). Plaintiff experienced

15  severe symptoms of plaintiff's Diabetic condition, including seizure-like activities, confusion, and

16  disorientation. Plaintiff's symptoms were so severe that another inmate with Diabetes observed

17  plaintiff's condition, and attempted to help plaintiff by giving him a couple of pieces of hard-

18  candy. (Brainerd Decl., ¶ 28). Moreover, plaintiff's medical complications were obvious to the

19  medical staff at the jail. The medical staff noted that plaintiff's diabetic condition was making

20  him "erratic" and, when plaintiff's blood sugar reached 465, the medical staff determined that the

21  "orders [were] unclear." (Ex. D [Def 14], Esberg Decl.).

22  **E.      The Lack of a Probable Cause Hearing.**

23         After plaintiff was arrested without a warrant, he was never taken before a magistrate or

24  judicial officer for a probable cause hearing. Instead, plaintiff was arrested on Thursday, May 19,

25  2005, at approximately 5:40 p.m., and released on Monday, May 23, 2005, at approximately

26  11:30 a.m. without any hearing whatsoever. Plaintiff was incarcerated for approximately 90

27  hours without any probable cause hearing, bail hearing, or any reasonable due process. Plaintiff

28  was also never charged with any crime, and released on Monday, May 23, 2005 after the District

-7-

1    Attorney's office refused to file any formal charges. During this period, plaintiff did not

2    understand why he was not taken before a neutral magistrate or judicial officer to present the

3    evidence to establish that there was no violation of any criminal law. (Brainerd Decl., ¶ 29).

4          Plaintiff also does not understand why he was not taken before a judge, magistrate, or

5    judicial officer on Friday, May 20, 2005. The courthouse was open on Friday, May 20, 2005, and

6    the jail was in the same city as the courthouse. When plaintiff was initially booked into the jail

7    on Thursday evening, several of the jail staff members advised plaintiff that he would be taken

8    before a judge the next morning for bail setting and/or a hearing. That never happened. Instead,

9    the other inmates that were booked on Thursday night were taken to the courthouse the next day,

10    but plaintiff was left in the jail without a hearing. When plaintiff asked for an explanation, the

11    jail staff informed plaintiff that they could hold him "over the weekend" without any hearing.

12    (Brainerd Decl, ¶ 30).

13          Defendants offer no explanation for this delay in their motion because there is no excuse

14    whatsoever for the delay. Instead, the defendants' Victim-Witness office assisted Ward and Boyd

15    in filing a Civil Temporary Restraining Order ("TRO") against plaintiff in Lake County Superior

16    Court on Friday, May 20, 2005, but defendants left plaintiff confined in the jail the entire day

17    without any hearing, warrant, or charges. (Ex. B, Def. Req. Jud. Not. [Def 255-260].).

18    According to defendants' motion, there was a judge available to conduct a hearing and sign a

19    Civil TRO for Boyd and Ward on Friday, May 20, 2005, but defendants failed to conduct a

20    probable cause hearing for plaintiff on that same day. *Id.*

21          Furthermore, on Friday, May 20, 2005, the defendants' District Attorney's office

22    "rejected" the case with a "Disposition Date" of "05/20/05". (Ex. A [Def 16, 22], Esberg Decl.;

23    Ex. A, Poore Decl.). Despite the fact that defendants' prosecutors had "rejected" the alleged

24    criminal case on Friday, May 20, 2005, defendants held plaintiff in the jail with a false probable

25    cause declaration until Monday, May 23, 2005. (Ex. A [Def 16, 22], Esberg Decl.; Ex. A, Poore

26    Decl.; Brainerd Decl., ¶ 29)

27          Defendants claim in this litigation that they submitted a "Declaration re Probable Cause

28    and Bail Setting" via "telephone" to a magistrate on Saturday, May 21, 2005, at approximately

-8-

1    12:30 p.m. – over 42 hours after plaintiff's arrest. Plaintiff was not present for this "telephone"

2    hearing; nor was plaintiff ever informed of this telephonic hearing. Instead, the first time plaintiff

3    became aware of such a purported telephone hearing was during the course of this litigation.

4    (Brainerd Decl., ¶ 31.).

5         The "Declaration re Probable Cause and Bail Setting" attached to defendants' motion

6    contains several factual inaccuracies. First, the declaration states that a "bat was in reach of

7    Brainerd". This is not true. There was no baseball bat in plaintiff's room or within his reach.

8    Second, the declaration states that plaintiff "admitted to making the threat, but said [he] never

9    meant it." This statement is equally false. Plaintiff never made such an admission. Instead,

10   Plaintiff flatly denied engaging in any "terrorist threats". Finally, the declaration states that

11   Plaintiff "threatened to hit roommate in the head with baseball bat". This statement is also false.

12   Plaintiff never made any such threat. (Brainerd Decl., ¶ 32). Once the probable cause declaration

13   is stripped of these false facts, there is not a scintilla of information that any crime was

14   committed. (Ex. B, Wristen Decl.).

15

16   **F.    The Continued Confinement to Assist a Private Litigant to Serve a Civil Temporary
           Restraining Order.**

17        Finally, after initially being formally released from the jail between approximately 10:00

18   a.m. and 10:30 a.m. on Monday, May 23, 2005, defendants unilaterally subjected plaintiff to

19   continued confinement for a period of approximately one (1) hour while the Sheriff's Department

20   coordinated the service of the May 20th "move-out" Civil TRO against plaintiff at the jail facility.

21   In particular, plaintiff was formally released between approximately 10:00 a.m. and 10:30 a.m.

22   that morning. However, instead of releasing plaintiff, the jail seized plaintiff without any charges

23   or reasonable suspicion. Although plaintiff was supposed to be released, the jail staff informed

24   plaintiff that he would "be held" until they could get the Civil TRO "faxed over to the jail" for

25   service upon plaintiff. During this period of time, plaintiff was locked-up inside the jail waiting

26   for the Civil TRO to be "faxed" to the facility, and was not free to leave. (Brainerd  Decl., ¶ 33).

27        Approximately an hour later, once the Civil TRO was faxed to the jail, plaintiff was

28   served with the Civil TRO by the Sheriff Department jail staff "per Bob with Victim Witness",

-9-

1   and then released without any of his money, transportation, or medication.  (Ex. A [Def 23],

2   Esberg Decl.; Ex. B, Poore Decl.; Brainerd Decl., ¶ 34).  In fact, all the money that plaintiff had

3   at the time of his arrest was returned to plaintiff in the form of a money order.  Plaintiff ended up

4   walking in a disorientated state for approximately six (6) miles to a local store with a telephone

5   that could cash the money order.  Furthermore, plaintiff was terminated from his job at the City of

6   Ukiah as a result of missing work on the previous Friday and failing to report for work on

7   Monday morning.  As a result, plaintiff lost his job; his financial security; his health benefits; his

8   house; and his dignity.  (Brainerd Decl., ¶ 34).

9

10  **G.    The County's Custom, Policy, and Practice with Respect to Probable Cause
        Hearings and Warrantless Arrests of Domestic Violence Suspects.**

11      Defendant County of Lake has a mandatory arrest policy in suspected domestic violence

12  cases without regard to what a reasonable investigation may uncover.  (Ex. C, Poore Decl.).

13  Additionally, once a suspect is arrested without a warrant, defendant County of Lake's written

14  policy requires a probable cause hearing within 48 hours.  (Ex. D, Poore Decl.).  However, the

15  written policy does not require prompt hearing or determination of probable cause, and does not

16  address the pertinent constitutional issue of delay.  *Id.*  Instead, the written policy expressly (and

17  implicitly) states that a probable cause hearing within 48 hours always passes constitutional

18  muster.

19

20  **III.    LEGAL ARGUMENT**

21  **A.    The Disputed Facts Demonstrate that the Arrest was Unlawful.**

22      The disputed facts establish that the arrest of plaintiff violated his constitutional rights.  In

23  particular, during the arrest, defendants violated plaintiff's constitutional rights against

24  unreasonable searches and seizures under the Fourth Amendment, and rights to counsel and

25  against self-incrimination under the Fifth Amendment; all of which are incorporated under the

26  Fourteenth Amendment.

27  \\\

28

1          1.     **Defendants Conducted an Unlawful Search under the Fourth Amendment.**

2          Prior to the arrest, defendants conducted an unlawful search under the Fourth

3   Amendment. Under federal law, an illegal search can provide a basis for liability under 42 U.S.C.

4   Section 1983. *Wilson v. Layne,* 526 U.S. 603 (1999). In order to conduct a lawful search of a

5   person's living quarters, the officer must have a valid search warrant, or some exception to the

6   warrant requirement. *Katz v. United States,* 389 U.S. 347 (1967). The only exception that could

7   possibly apply in this situation is "consent" of the owner to conduct a search. *United States v.*

8   *Matlock,* 415 U.S. 164 (1974). However, when a house is jointly occupied and/or owned by two

9   or more persons, the mere fact that one owner gives consent does not mean that the officers have

10  a blank check to enter and search the entire premises. *Illinois v. Rodriquez,* 497 U.S. 177 (1990).

11  The pertinent question is whether the consenting party has actual or apparent authority to

12  authorize a search of the entire residence, including the private locations of the non-consenting

13  party. *Florida v. Jimeno,* 500 U.S. 248 (1991); *Georgia v. Randolph,* 126 S.Ct. 1515, 1519

14  (2006) [When two occupants are physically present at the house, and one consented but the other

15  did not, the officers were obligated to obtain a warrant as to the objecting party.].

16         In this case, it is undisputed that the officers did not have a search warrant when they

17  entered plaintiff's house. It is equally undisputed that they did not obtain any consent from

18  plaintiff prior to entering his private room in the house, including any search for the baseball bat.

19  As a result, the defendants were required to obtain a warrant prior to entering plaintiff's room; an

20  area in which he has a reasonable expectation of privacy. Their failure to do so violated

21  plaintiff's Fourth Amendment rights against unreasonable searches.

22         Despite the lack of a warrant, the defendants contend that their search met constitutional

23  muster because they obtained "consent" from plaintiff's roommates. However, there is no

24  evidence whatsoever that plaintiffs' roommates had any authority – actual or apparent – to allow

25  the officers to enter plaintiff's private room. The officers knew that each roommate, including

26  plaintiff, owned a one-third share of the house. The officers further knew that each roommate

27  had their own private room within the house. Given the situation at hand, including the obvious

28  dispute between the roommates, the officers further knew that plaintiffs' roommates had no

-11-

1  authority to give the officers consent to enter plaintiff's private room. Since the officers failed to

2  obtain a warrant or consent from plaintiff to enter his private room, there actions violated

3  plaintiff's Fourth Amendment rights, and the motion must be denied.

4
5
       2.     **Defendants Engaged in Custodial Interrogation without Advising Plaintiff of his Constitutional Rights.**

6        Moreover, defendants violated plaintiff's Fifth and Fourteenth Amendment rights when

7  they engaged in custodial interrogation without advising plaintiff of his constitutional rights to

8  counsel and against self-incrimination. It is now well established that an officer is required to

9  provide *Miranda* warnings prior to any custodial interrogation. *Dickerson v. United States,* 530

10 U.S. 428 (2000); *Miranda v. Arizona,* 384 U.S. 436 (1966). The failure to provide these warnings

11 results in a violation of the suspect's substantive due process rights under the Fifth and Fourteenth

12 Amendments even if any of the purported statements are not used in a criminal proceeding.

13 *Chavez v. Martinez,* 123 S.Ct. 1994 (2003).

14       In this case, there is little doubt that plaintiff was subjected to custodial interrogation when

15 the defendants questioned plaintiff in his room, after he was arrested, and then later at the jail

16 facility. However, defendants concede that they never advised plaintiff of his constitutional rights

17 to counsel and against self-incrimination. As a result, defendants have violated plaintiff's due

18 process rights, and the motion should be denied.

19       3.     **Defendants' Unlawful Arrest.**

20       Defendants further conducted an unlawful arrest of plaintiff when they seized him for

21 allegedly violating California Penal Code Section 422 – Terrorist Threats. Under the Fourth

22 Amendment, an arrest must be supported by objectively reasonable probable cause to believe that

23 the arrestee has committed a crime. *Maryland v. Pringle,* 540 U.S. 366 (2003). In support of

24 their motion, defendants rely upon a litany of disputed facts in an attempt to establish that

25 probable cause existed for plaintiff's arrest. In particular, defendants contend that they had

26 sufficient probable cause to arrest plaintiff for "terrorist threats" because (1) "Brainerd had the

27 means available to carry out his threat", (2) plaintiff admitted to making the threat and stating he

28 "would 'do what he had to do'", and (3) the baseball bat was in plaintiff's room within his reach.

-12-

1    However, as stated above, these facts are disputed by admissible evidence attached to this

2    opposition, and, as such, defendants' motion must be denied.

3          Defendants' reliance on *Peng v. Mei Chin Penghu*, 335 F.3d 970 (9th Cir. 2003), does not

4    provide a different outcome.  In *Peng*, the Ninth Circuit expressly held (as defendants concede)

5    that the alleged victim's statements must be corroborated by the surrounding circumstances. *Id.*

6    at 979.   Here, there is no evidence to even remotely corroborate the extremely suspicious

7    statements of plaintiff's roommates.  There was no baseball bat in the house; no baseball bat was

8    within reach of plaintiff; no baseball bat was in plaintiff's room; and the officers failed to take

9    any baseball bat into evidence or conduct any reasonable investigation into plaintiff's roommates

10   suspicious allegations. *Gardenhire v. Schubert*, 205 F.3d 303, 315 (6th Cir. 2000) [probable cause

11   did not exist when police failed to investigate exculpatory evidence]; *Allen v. City of Portland*, 73

12   F.3d 232, 236 (9th Cir. 1995) [warrentless arrest illegal when the dispute was a civil contract

13   matter involving an argument over the validity of a coupon].   There was also no undisputed

14   evidence to establish that plaintiff's alleged "admissions" corroborated any crime.  Furthermore,

15   there is no evidence that any such "terrorist threat" was "unconditional" on its face, or that there

16   was any "immediate" and "specific" intent to carry out the alleged threat. *People v. Brown*, 20

17   Cal.App.4[th] 1251 (1993) [Penal Code Section 422 implicates obvious First Amendment concerns,

18   and, as such, requires specific evidence of an "unconditional threat" that is immediate with

19   "specific intent" on the part of the suspect].  Instead, the circumstances surrounding this dispute

20   would be apparent to any reasonable law enforcement official: this case involved a simple civil

21   dispute about the ownership of a house, and the roommates were attempting any means possible

22   to force plaintiff out of his investment.  Since the material facts are disputed, the motion must be

23   denied.

24   \\\

25   \\\

26   \\\

27   \\\

28

**B.    The Undisputed Facts Show that the Alleged Probable Cause Determination was Not Prompt or Timely.**

      1.    **Plaintiff was Not Brought Before a Neutral Magistrate.**

      Once a person is arrested without a warrant, the person "must promptly be brought before a neutral magistrate for a judicial determination of probable cause." *County of Riverside v. McLaughlin,* 500 U.S. 44, 53 (1991). The standard is one of promptness and reliability, and, in most circumstances, the "judicial determination of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement." *Id.* at 56; *Jones v. City of Santa Monica,* 382 F.3d 1052 (9th Cir. 2004). This does not mean that every judicial determination of probable cause within 48 hours is valid. The question is whether the judicial determination is prompt under the circumstances, or whether there was unreasonable delay in making such a determination. *Halvorsen v. Baird,* 146 F.3d 680, 688-690 (9th Cir. 1998) [six-hour hold was unreasonable under the circumstances]; *Llaguno v. Mingey,* 739 F.2d 1186 (7th Cir. 1984) [42-hour delay is unreasonable under the circumstances]; *Austin v. Hamilton,* 945 F.2d 1155 (10th Cir. 1991) [12-hour delay was unreasonable]; *Bernard v. City of Palo Alto,* 699 F.2d 1023 (9th Cir. 1983) [more than 24 hour delay unreasonable under the circumstances].

      In this case, plaintiff was not promptly brought before any neutral magistrate or judicial officer for a determination of probable cause. It is undisputed that plaintiff was arrested without a warrant, and defendants were obligated to provide a probable cause hearing promptly. However, defendants failed to bring plaintiff before any neutral magistrate for a judicial determination of probable cause. Instead, plaintiff was incarcerated for approximately 90 hours without being brought before any magistrate.

      2.    **There is No Evidence of Any Probable Cause Hearing.**

      There is also insufficient evidence that a probable cause hearing actually took place. While defendants provide this Court with a pre-printed "telephone" form allegedly showing that a magistrate reviewed a declaration for probable cause approximately 42 hours after plaintiff was arrested, the defendants utterly failed to authenticate this document, or submit any evidence that an actual hearing or judicial determination took place. None of the declarants, including the

-14-

1   arresting officers, have testified that they attended this Saturday hearing (either by telephone or in
2   person), and defendants have failed to produce any declaration from the judicial officer stating
3   that such a hearing took place.  Instead, defendants simply state that they "understand that this
4   Declaration was submitted to a magistrate for determination", but fail to submit any admissible
5   evidence to establish that such a hearing occurred.  (Wristen Decl., ¶ 11.)  Accordingly,
6   defendants' motion must be denied.

7          3.      **The Arresting Officer's Declaration of Probable Cause Contained False**
8                  **Information, and Rendered Any Probable Cause Determination Invalid on its**
                   **Face.**

9          Moreover, even if there was a timely probable cause determination on Saturday, the
10  arresting officer's Declaration of Probable Cause contains false facts, and tainted the entire
11  process.  First, the declaration states that a "bat was in reach of Brainerd".  This is not true.  There
12  was no baseball bat in plaintiff's room or within his reach.  Second, the declaration states that
13  plaintiff "admitted to making the threat, but said [he] never meant it."  This statement is equally
14  false.  Plaintiff never made such an admission.  Instead, Plaintiff flatly denied engaging in any
15  "terrorist threats".  Finally, the declaration states that Plaintiff "threatened to hit roommate in the
16  head with baseball bat".  This statement is also false.  Plaintiff never made any such threat.
17  (Brainerd Decl., ¶ 32).  Once the probable cause declaration is stripped of these false facts, there
18  is not a scintilla of information that any crime was committed.  (Ex. B, Wristen Decl.).

19         4.      **A Telephonic Determination of Probable Cause After 42 Hours of**
20                 **Confinement Without Any Explanation of Delay is Unreasonable under the**
                   **Fourth Amendment.**

21         Even if there was sufficient evidence of a probable cause hearing, a telephonic
22  determination of probable cause after 42 hours of unexplained delay is sufficient to create a
23  triable issue of fact.   *Austin v. Hamilton*, 945 F.2d 1155, 1162-1163 (10th Cir. 1991)
24  [reasonableness of detention is a jury question].   In this case, the defendants provide no
25  justification for not bringing plaintiff before a magistrate on Friday, May 20, 2005.  The
26  undisputed evidence shows that the courthouse was open, and the defendants' Victim-Witness
27  office was able to assist Boyd and Ward in obtaining a hearing on their Civil TRO on that Friday.
28  Moreover, the other inmates were transported to the courthouse on Friday, but, for whatever

1   reason, plaintiff was left behind. When plaintiff asked for a reasonable explanation, defendants'
2   jail staff simply informed him that they could hold him "over the weekend." Furthermore, the
3   disputed evidence shows that the defendants' District Attorneys' office rejected the case on
4   Friday, May 20, 2005, and, as a result, there was no further basis to continue to hold plaintiff in
5   confinement.    In short, defendants have failed to explain why they waited until a Saturday
6   afternoon after 42 hours of confinement to hold a mysterious "telephone" probable cause hearing
7   when the Constitution requires "promptness".

8
9   **C.    The Continued Seizure of Plaintiff to Assist a Civil Litigant to Serve a Civil
        Temporary Restraining Order Violates the Fourth Amendment.**

10          Furthermore, the continued seizure of plaintiff at the jail to assist Boyd and Ward to serve
11   a Civil TRO unmistakably violates the Fourth Amendment. It is well established that seizures
12   without a warrant must be based upon probable cause that a crime has been committed.
13   *Devenpeck v. Alford,* 543 U.S. 146 (2004). The police may not seize a person in order to assist a
14   private litigant to prosecute his or her civil case. Here, it is undisputed that defendants held
15   plaintiff for approximately one hour after he was formally released from the jail in order to serve
16   him with a Civil TRO on behalf of Ward "per Bob at Victim-Witness". This conduct constituted
17   a per se violation of plaintiff's Fourth Amendment rights in which the defendants have no
18   defense.

19  **D.    Defendants Were Deliberately Indifferent to Plaintiff's Medical Needs when they
        Provided the Wrong Medication and Diet with Actual Knowledge of the
20       Consequences.**

21          Plaintiff can also establish that defendants were deliberately indifferent to plaintiff's
22   medical needs once he was taken into custody. A pretrial detainee has a right to medical care and
23   treatment under the Fourteenth Amendment. *Gibson v. County of Washoe,* 290 F.3d 1175 (9th
24   Cir. 2002). In order to establish a violation of the Fourteenth Amendment with respect to medical
25   care, the plaintiff must establish (1) a failure to respond to a possible medical need, and (2) the
26   lack of care was the result of deliberate indifference. *Farmer v. Brennan,* 511 U.S. 825 (1994).
27   Deliberate indifference exists when the state actor has notice of the need for medical care, and
28   either denies, delays, or interferes with medical treatment. *Hutchinson v. United States,* 838 F.2d

-16-

1    390 (9th Cir. 1988). The failure to provide needed medication constitutes deliberate indifference
2    when the defendants have knowledge of the condition, including the need for medication. *Gil v.*
3    *Reed,* 381 F.3d 649, 659 (7th Cir. 2004).

4    　　In this case, plaintiff has established each element of this cause of action. First, plaintiff
5    has shown that defendants had actual (not constructive) knowledge of his severe Diabetic
6    condition. Defendants have conceded that plaintiff suffered from a serious medical condition,
7    and defendants' own documentation establish that they knew plaintiff had Type I Diabetes.
8    Second, the evidence shows that defendants were deliberately indifferent to plaintiff's medical
9    needs. In particular, defendants knew that plaintiff requires a strict medication regime, including
10   the use of Lantis, but defendants provided plaintiff with the wrong medications consistently
11   throughout his confinement in the jail. As a result, plaintiff's blood sugar rose above 500, and
12   plaintiff began to experience seizure-like activities and other symptoms consistent with an
13   uncontrolled Diabetic condition. Accordingly, plaintiff has produced sufficient evidence to
14   establish this claim, and defendants' motion must be denied.

15   **E.    The Arresting Officers are Liable for the Third and Fourth Causes of Action.**

16   　　The individual defendants claim that they cannot be liable for plaintiff's continued
17   confinement in the jail, or his claim of inadequate medical treatment. Instead, the arresting
18   officers contend that their liability ends once they dropped plaintiff off at the jail. Not
19   surprisingly, defendants cite no legal authority for their position.

20   　　In a civil rights case, the defendants are liable for any natural and foreseeable
21   consequences of their actions. *Jackson v. Sauls,* 206 F.3d 1156, 1168 (11th Cir. 2000). The
22   question is one of simple proximate causation. *Hedges v. Musco,* 204 F.3d 109, 121 (3d Cir.
23   2000). Here, there are sufficient facts to demonstrate that the individual defendants engaged in
24   conduct which caused plaintiff to be arrested and confined in the County jail for a period of 90
25   hours. The individual defendants wrongfully arrested plaintiff; denied his requests for his
26   medications; completed a false and inaccurate Declaration of Probable Cause; and thereby caused
27   plaintiff to be confined in the jail. In short, but for the defendants' unlawful conduct, plaintiff

28

1   would not have been held for 90 hours in jail. Accordingly, this argument should be quickly

2   dismissed.

3   **F.    The Arresting Officers are Not Entitled to Qualified Immunity.**

4            The arresting officers' claim of qualified immunity rests solely upon the same disputed

5   facts asserted above (i.e. defendants' argue they are entitled to qualified immunity because

6   "[b]oth deputies observed the baseball bat in Brainerd's room" and Brainerd made several

7   admissions). As a result, once the facts are viewed in the light most favorable to plaintiff, there is

8   no dispute that the constitutional rights listed above were well established in May 2005, and any

9   reasonable law enforcement officer should have known that these rights were established.

10  *LaLonde v. County of Riverside*, 204 F.3d 947 (9th Cir. 2004). Accordingly, defendants' claim of

11  qualified immunity must be denied at the summary judgment stage.

12  **G.    There is Sufficient Support for the Monell Liability Claim.**

13           Likewise, there are sufficient disputed facts to establish that the County of Lake had the

14  following customs, patterns, or practices: (1) defendant had a mandatory arrest policy in

15  domestic violence cases, and (2) defendant had a written policy of conducting probable cause

16  hearings without regard to the "promptness" requirement under the Constitution. *County of*

17  *Riverside v. McLaughlin*, 500 U.S. 44, 53 (1991). This evidence is sufficient to establish a

18  custom, pattern, or practice. *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

19           Finally, to the extent that the Court determines that there is insufficient evidence to

20  establish a *Monell* liability claim, plaintiff respectfully requests a continuance to compel

21  defendant County of Lake to adequately respond to discovery. In particular, plaintiff propounded

22  written discovery, including a request for production of documents, seeking information

23  pertaining to defendants' policies and procedures in handling domestic violence cases. Defendant

24  lodged nothing but boilerplate objections to these requests, and has denied plaintiff his right to

25  discovery on this subject-matter. Accordingly, plaintiff requests a continuance to seek an order

26  compelling production of these records so that plaintiff can adequately oppose this portion of the

27  motion.

28

1

## IV.    CONCLUSION

Based upon the foregoing, plaintiff respectfully requests that the Court deny defendants'

motion for summary judgment.

Date: July 1, 2008                              KAHN BROWN & POORE LLP

By:_____

David Poore
Attorneys for Plaintiffs

-19-