David M. Poore, SBN 192541
KAHN BROWN & POORE LLP
755 Baywood Drive, Suite 185
Petaluma, California 94954
Telephone:  (707) 763-7100
Facsimile:  (707) 763-7180
dpoore@kahnbrownlaw.com

Attorneys for Plaintiff
MICHAEL BRAINERD

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL BRAINERD,<br><br>　　　　Plaintiff,<br><br>v.<br><br>COUNTY OF LAKE; LAKE COUNTY SHERIFF'S OFFICE; and DOES 1 through 50, inclusive,<br><br>　　　　Defendants. | Case No.  C 07 2663 EDL<br><br>**DECLARATION OF MICHAEL BRAINERD IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date:　　　July 22, 2008<br>Time:　　　9:00 a.m.<br>Location:　Courtroom E, 15th Floor<br><br>Hon. Elizabeth D. Laporte |

I, MICHAEL BRAINERD, declare as follows:

1.  I am the plaintiff in this matter. I have personal knowledge of the matters stated in this declaration and could competently testify to them if called as a witness. Pursuant to federal law and this Court's local rules, I submit this declaration in opposition to defendants' joint motion for summary judgment.

**DISPUTED FACTS IN THE ARRESTING OFFICER'S DECLARATIONS**

2.  I have reviewed the declarations of defendants Matthew Wristen and Emil Devincenzi, the arresting officers in my case, that were filed in support of defendants' joint motion for summary judgment.

3.  In those declarations (which are virtually identical), the defendants claim that the following facts are undisputed: (1) "upon questioning Brainerd admitted that he made the threat against Bobby Boyd but that he did not mean it"; (2) "Brainerd stated that he felt he was being 'fucked with' by Boyd and Ward"; (3) "Brainerd admitted that he had a baseball bat in his room"; (4) that the officers "actually observed the baseball bat in Brainerd's room"; (5) I allegedly stated that I "was not going to be 'fucked with' and that he would do what he had to do" with the baseball bat; (6) I had allegedly "consumed a couple of beers after work" on the date of the arrest; and (7) once I was transported to the jail, I admitted that I "was sorry [I] had made the treat and that [I] would never hurt anyone". (Devincenzi Decl., ¶¶ 4, 5, 9; Wristen Decl., ¶¶ 4, 5, 8, 9.)

4.  I dispute these facts.

5.  At no time did I ever admit to making "the threat" against Bobby Boyd. Moreover, at no time did I ever admit to making any such threat with the caveat that I "did not mean it". In fact, at no time did I make any such "terrorist threat" against any of my roommates on May 19, 2005.

6.  At no time did I advise the officers that I was being "fucked with" by Boyd or Ward.

7.  At no time did I admit that I had "a baseball bat" in my room. There was no baseball bat in my room on May 19, 2005.

8. At no time could the officers have observed any baseball bat in my room because there was no baseball bat in my room on May 19, 2005. Moreover, the officers did not take any such baseball bat into evidence, or take any photographs or any other images to establish there was a baseball bat in my room.

9. At no time did I ever state that I would "do what [I] had to do" in response to any questioning, including any such comments in this same context about being "fucked with".

10. I did not consume "a couple of beers" after work. I had one (1) beer after work more than two hours before this incident. In fact, one beer is my basic limit due to the effect alcohol has on my medical condition.

11. Once I was transported to the jail, I never admitted that I "was sorry" for making "the threat", and never stated that I "would never hurt anyone" in such a context.

12. Instead, I have consistently denied the allegations surrounding my arrest under Penal Code Section 422 – Terrorist Threats. On May 19, 2005 (or any other date), I never made any such "terrorist threats" to my roommates, and never admitted to making any criminal threats whatsoever.

## THE DISPUTE WITH MY ROOMMATES

13. In 2003, I purchased a house with my two roommates, Marci Ward and Bobby Boyd, located at 5269 Blue Lakes Road in Upper Lakes, California. We purchased the house as both an investment property and place to reside together. The house had three separate, private bedrooms. Although Ms. Ward had limited financial means, we all agreed that ownership in the house would be "one-third" for each roommate. Prior to the purchased of the house, I had a long-term intimate relationship with Ms. Ward.

14. Prior to moving into the home I purchased with Marci Ward and Bobby Boyd, my romantic relationship with Ms. Ward came to an end. Although I was disappointed that the relationship had come to an end, I accepted the situation, and lived in a separate private room in the residence.

15. Over the course of the next several months, the relationship between the roommates deteriorated. After numerous discussions regarding the status of the house, Ms. Ward

-3-

and Mr. Boyd advised me that they wanted to purchase my share of the house. As a result, on or about May 17, 2005, my roommates offered to "buy-out" my share of the house for $10,000.00-$11,000.00; much less than my initial investment and the amount of mortgage payments and expenses that I invested in the house. Immediately after this offer, I consulted with a real estate broker to determine if the amount offered was reasonable under the circumstances. The broker advised me that the amount offered by my roommates was too low in light of the real-estate market in Lake County, and that a more reasonable amount would be approximately $27,000.00.

16. On May 18, 2005, the next day, I informed my roommates that the broker had assessed my share of the house at approximately $27,000.00, and that I was willing to accept $26,000.00 as a fair value to purchase my one-third ownership. When my roommates heard this counter-offer, they were furious. They told me that they did not have the funds for such a purchase. I then advised my roommates that we had no choice but to select a force-sale of the house so that I could be adequately compensated for my investment. Mr. Boyd and Ms. Ward became even more furious at me, and made several condescending remarks. The roommates became even more furious.

17. I did not know that, after this argument, Ms. Ward had gone down to defendant County of Lake's Victim-Witness office to seek an immediate "move-out" order against me for allegations of "verbal abuse." In fact, I committed no such acts of "verbal abuse", and this attempt to obtain a "move-out" order was nothing more than a sham to deprive me of full value for my investment.

## THE ARREST

18. In the afternoon of May 19, 2005, I returned home from my job at the City of Ukiah. I had consumed one (1) beer after work, and was not impaired in any manner. When I arrived at the house, Ms. Ward was in her room. I did not disturb her, and went directly into my room. An hour later, at approximately 4:30 p.m., Mr. Boyd returned home from his job. When I walked out of my room to go to the kitchen, Ms. Ward and Mr. Boyd approached me to discuss the "situation" regarding the house. I again advised them that he would not accept any offer less than full reasonable value for my investment.

-4-

19. In response, Mr. Boyd became belligerent and angry towards me, and attempted to coerce me into accepting less than full value for my share of the house. In particular, Mr. Boyd advised me that he "can make it appear as though I had not made any payments" on the house. Mr. Boyd told me that he could destroy "the paper trail" to make it appear as though I deserved less on the house. I immediately advised Mr. Boyd that he was "not being reasonable", and that we would have to resort to the legal process for a force-sale. Mr. Boyd then clenched his fists together as though he was going to hit me, and stated words to the effect of "come on" and "try to hit me." I immediately replied that "this is not worth it", and went back into my room for the remainder of the evening. At that point, I believed that the argument was over.

20. At no point during this argument did I ever threaten to hit anyone with a "baseball bat" or make any "terrorist threats" of any kind. In fact, there was no baseball bat in the house.

21. Approximately 40-45 minutes later, two Sheriff Deputies (the two individual defendants in this case) from defendant County of Lake entered my private room. At this time, I was sitting at the desk in my room alone. I did not have a baseball bat or any other weapon inside the room, or within my reach. The officers did not have a warrant to enter my private room, and I never provided any consent for them to come inside my room. Despite the lack of a warrant or consent, the two defendant-officers entered my room without any permission. One of the officers stood over me, and the other officer blocked the doorway. I reasonably believed that I was not free to leave, and could not simply get up and walk out the door.

22. None of the defendants advised me of my *Miranda* rights, including a right to remain silent or right to counsel prior to any questioning.

23. Despite the lack of disclosure of my rights, the defendants began interrogating me in my room. The younger-appearing Deputy asked me if I "had a baseball bat in the house." I immediately replied, "No." The Deputy then advised me that he was being "handcuffed" and "verbally charged" with an undisclosed crime. When I asked why I was "being taken away", the Deputy informed me that I was being charged with a "terrorist threat." However, the defendants still did not advise me of any rights to remain silent or to counsel. When I heard this information, I was visibly shocked. I informed the that this was "ridiculous" and that it was nothing more than

-5-

an argument with my roommates over their continued attempts to impermissibly force me out of the house. I offered to give a sworn statement to this affect. The Deputy appeared disinterested, and, instead of conducting any reasonable investigation, immediately arrested me without a warrant and charged me with being a "felony terrorist."

24.  Once the defendant-officers placed me into handcuffs, they again asked me if I owned a "baseball bat" that was stored in my room. I again advised the officers that there was no baseball bat in my room. The defendants then escorted me out of the house, and mentioned that they need to talk to my roommates.

25.  At no point in time did I have a baseball bat "in [my] room" or "within [my] reach." Moreover, although the defendant-officers apparently charged me with making felony "terrorist threats" with a baseball bat, the defendants never conducted a search for the baseball bat in my room; never collected any baseball bat into evidence; never took any pictures or video-footage of the alleged baseball bat; never located any baseball bat inside my room; and made no efforts to locate and/or collect this mysterious baseball bat anywhere inside the house. Additionally, each time that I attempted to explain that the charges were baseless and nothing more than a civil matter involving a financial dispute amongst my roommates, the defendant-officers would appear disinterested, cut me off in mid-sentence, and openly refused to adequately investigate the circumstances surrounding my roommates' attempts to force me to "move-out" of the house.

26.  The defendant-officers then placed me in the back of their patrol car which was parked adjacent to my house. The entire situation was extremely humiliating to me. Prior to being placed in the patrol car, I advised the officers that I had an extremely serious and brittle case of Type I Diabetes that required a very specific form of medication treatment, including the use of Lantis, a necessary diabetic drug to prevent seizure activities and/or a diabetic coma. I further advised the officers that stressful situations significantly aggravate my Diabetic medical condition. As a result, I asked the officers that I be allowed to take this medication with me, or, in the alternative, that they take custody of my medication so that it can be made available to me. They refused. As a result, my blood sugar level increased to a count of 234 by the time I was

processed in the jail. My normal controlled blood sugar level with Lantis was in the range of 90 to 120.

## INADEQUATE MEDICAL TREATMENT

27. Once I was processed into the defendant County of Lake jail, I advised the staff that I had a strict-diet for my Type I Diabetes, and that I absolutely required the use of Lantis to control my medical condition. I informed the jail staff that my blood sugar level would sky-rocket to extremely dangerous levels if the Lantis medication regime was not followed.

28. Despite my instructions, the jail staff provided me the wrong medications during my incarceration, and failed to provide me with the dietary requirements for my medical condition. Instead, throughout my incarceration, I was provided with low-doses of "regular insulin". As a result, my Diabetic condition became uncontrollable, and my blood sugar levels reached into the range of 465 to 538. I experienced severe symptoms of my Diabetic condition, including seizure-like activities, confusion, and disorientation. My symptoms were so severe that another inmate with Diabetes observed my condition, and attempted to help me by giving me a couple of pieces of hard-candy.

## NO PROBABLE CAUSE HEARING

29. After I was arrested without a warrant, I was never taken before a magistrate or judicial officer for a probable cause hearing. Instead, I was arrested on Thursday, May 19, 2005, at approximately 5:40 p.m., and released on Monday, May 23, 2005, at approximately 11:30 a.m. without any hearing whatsoever. I was incarcerated for approximately 90 hours without any probable cause hearing, bail hearing, or any due process. I was also never charged with any crime, and released on Monday, May 23, 2005 after the District Attorney's office refused to file any formal charges. During this period, I do not understand why I was not taken before a neutral magistrate or judicial officer to present the evidence to establish that there was no violation of any criminal law.

30. I also do not understand why I was not taken before a judge, magistrate, or judicial officer on Friday, May 20, 2005. The courthouse was open on Friday, May 20, 2005, and the jail was in the same city as the courthouse. When I was initially booked into the jail on Thursday

evening, several of the jail staff members advised me that I would be taken before a judge the next morning for bail setting and/or a hearing. That never happened. Instead, the other inmates that were booked on Thursday night were taken to the courthouse the next day, but I was left in the jail without a hearing. When I asked for an explanation, the jail staff informed me that they could hold me "over the weekend" without any hearing.

31. I understand that the defendants claim in this litigation that they submitted a "Declaration re Probable Cause and Bail Setting" via "telephone" to a magistrate on Saturday, May 21, 2005, at approximately 12:30 p.m. – over <u>42 hours</u> after my arrest. I was not present for this "telephone" hearing; nor was I ever informed of this telephonic hearing. Instead, the first time I became aware of such a purported telephone hearing was during the course of this litigation.

32. I have reviewed the "Declaration re Probable Cause and Bail Setting" attached to defendants' motion. This declaration contains several factual inaccuracies. First, the declaration states that a "bat was in reach of [me]". This is not true. There was no baseball bat in my room or within my reach. Second, the declaration states that I "admitted to making the threat, but said [I] never meant it." This statement is equally false. I never made such an admission. Instead, I flatly denied engaging in any "terrorist threats". Finally, the declaration states that I "threatened to hit roommate in the head with baseball bat". This statement is also false. I never made any such threat.

### **CONTINUED CONFINEMENT TO SERVE THE CIVIL T.R.O**

33. Finally, after initially being released between approximately 10:00 a.m. and 10:30 a.m. on Monday, May 23, 2005, I was subjected to continued confinement for a period of approximately one (1) hour while the Sheriff's Department served a Civil Temporary Restraining Order ("TRO") against me by Ms. Boyd requesting a "move-out" order. In particular, I was released between approximately 10:00 a.m. and 10:30 a.m. that morning. However, the jail staff informed me that I would "be held" until they could get the Civil TRO "faxed over to the jail" for service upon me. During this period of time when we were waiting for the Civil TRO to be "faxed", I was locked-up inside the jail, and was not free to leave.

34. Approximately an hour later, once the Civil TRO was faxed to the jail, I was served with the TRO by the Sheriff Department jail staff, and then released without any of my money, transportation, or medication. In fact, all the money that I had at the time of my arrest was returned to me in the form of a money order. I ended up walking in a disorientated state for approximately six (6) miles to a local store with a phone and to cash the money order. Furthermore, I was terminated from my job at the City of Ukiah as a result of missing work on the previous Friday and failing to report for work on Monday morning. As a result, I lost my job; my financial security; my health benefits; my house; and my dignity.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.

Executed this 1st Day of July, 2008 at Upper Lakes, California.

*/s/ Michael C. Brainerd*
MICHAEL BRAINERD