1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MICHAEL BRAINERD,                                No. C-07-02663  EDL

        Plaintiff,                          **ORDER GRANTING SUMMARY JUDGMENT**

  v.

COUNTY OF LAKE, et al.,

        Defendants.
_____/

**I.      BACKGROUND**

      This is a 42 U.S.C. § 1983 civil rights action that arises out of the May 19, 2005 arrest and detention of Plaintiff Michael Brainerd by the Lake County Sheriff.  Brainerd, who has Type I diabetes, was detained at the Lake County Jail until May 23, 2005 when he was released.  This action was filed on May 18, 2007, and Plaintiff amended his complaint on December 3, 2007. Plaintiff alleges claims for unlawful arrest, unreasonable search and seizure, failure to provide a timely probable cause hearing, and illegal incarceration/failure to provide medical treatment.  All claims are against Defendants County of Lake, Lake County Sheriff's Office, and arresting officers Matthew Wristen and Emil Devincenzi (collectively, "Defendants").  Defendants now move for summary judgment on all claims.  The Court held a hearing on Defendants' Motion on July 22, 2008.  Having read the parties' papers and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby GRANTS Defendants' motion, for the reasons stated at the hearing and as follows.

///
///

**II.    DISCUSSION**

    **A.    Legal Standard**

       Summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(c).  Material facts are those which may affect the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  Id.  "To show the existence of a 'genuine' issue, . . . [a plaintiff] must produce at least some significant probative evidence tending to support the complaint."  Smolen v. Deloitte, Haskins & Sells, 921 F.2d 959, 963 (9th Cir. 1990) (quotations omitted).  The court must not weigh the evidence or determine the truth of the matter, but only determine whether there is a genuine issue for trial.  Balint v. Carson City, 180 F.3d 1047, 1054 (9th Cir. 1999).  The court must view the facts in the light most favorable to the non-moving party and give it the benefit of all reasonable inferences to be drawn from those facts.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

       A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case.  Id.  If the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion.  See Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 250.

///

///

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1 ///

2 **B.     Facts In Light Most Favorable to Plaintiff**

3    As of May 19, 2005, Michael Brainerd resided at 5296 Blue Lakes Road in Upper Lake

4 California, with Marci Ward and Bobby Boyd.  All three roommates owned part of the residence.

5 Brainerd and Ward were previously a couple, but continued in a platonic relationship as roommates

6 in approximately 2003.  Brainerd Depo. at 11, 44-45.

7    1.     The Arrest

8    Tension had been building in the six months preceding May 19, 2005, as Ward and Boyd

9 wanted to buy Brainerd out of the house, but Brainerd did not want to do so.  Id. at 49, 57.  The

10 roommates had been involved in verbal altercations.  Id. at 52-54.  According to Brainerd, he was

11 willing to accept a fair value to purchase his third ownership in the house, but his roommates offered

12 him far less than that.  Brainerd Decl. ¶¶ 15-16.  On May 19, Boyd, Brainerd, and Ward were all

13 yelling at each other.  Id. at 62-63.  According to Brainerd, in the midst of the argument he left and

14 went to get away from them and walked out and did work in the front yard.  Id. at 54.  He was sitting

15 in his room when a Lake County Sheriff's Deputy first entered.  Id. at 64.

16    At approximately 5:40 pm on May 19, 2005, Lake County Sheriff Deputies Matthew Wristen

17 and Emil Devincenzi were dispatched to Plaintiff's house after a call was made reporting an

18 altercation.  When they arrived at the house, Ward and Boyd, the complaining residents, reported an

19 argument pertaining to finances between the three roommates.  Ward and Boyd reported to the

20 deputies that they were attempting to purchase Brainerd's share in the residence.  Ward and Boyd

21 reported that in the course of the argument, Brainerd became angry and got in Boyd's face.  They

22 stated that Brainerd raised his fist as if he was going to strike Boyd.  They reported that Brainerd

23 then walked away and stated he intended to get a baseball bat and hit Boyd in the head with it.

24 Wristen Decl. ¶¶ 3-4; Devincenzi Decl. ¶¶ 3-4.  The deputies observed that Boyd was crying and

25 stated that he was seriously frightened as a result of Brainerd's threat.  Wristen Decl. ¶ 6;

26 Devincenzi Decl. ¶ 6.  Further, Brainerd confirmed that Ward was fearful and crying and that Boyd

27 was crying.  Brainerd Depo. at 75. Brainerd has not disputed facts regarding what Ward and Boyd

28 reported to the deputies and their demeanor.

**United States District Court**
For the Northern District of California

1     Boyd and Ward gave the deputies permission to enter the residence.  Brainerd states that he

2  did not give the deputies permission to enter his bedroom where he was sitting, but they entered the

3  room without his permission, and that one of the officers stood over him, and the other blocked the

4  doorway.  Brainerd Decl. ¶ 21.  However, Brainerd does not allege that he objected when the

5  officers entered the residence or when they entered his room.  Neither officer advised him of his

6  <u>Miranda</u> rights prior to questioning.  <u>Id</u>. ¶ 22.

7     The facts are disputed regarding Brainerd's response to the officers' questioning.  Upon

8  questioning, according to the officers, Brainerd admitted to the officers that he made the threat

9  against Boyd but stated that he did not mean it, and admitted that he had a baseball bat in his room,

10  which was observed by the officers in his room.  Wristen Decl. ¶ 5; Devincenzi Decl. ¶ 5.  When

11  Wristen explained to Brainerd that a threat to hit someone with a bat is a crime, Brainerd responded

12  that he was not going to be "fucked with" and would do what he had to do.  <u>Id</u>.  However, the facts

13  in the light most favorable to Plaintiff are that he never admitted to making a threat against Boyd,

14  never advised the officers that he was being "fucked with" by his roommates, never admitted that he

15  had a baseball bat in his room – to the contrary, there was no baseball bat in his room on that date –

16  and he never stated that he would "do what he had to do."  Brainerd Decl. ¶¶ 5-9.  The Court

17  considers Brainerd's version of the facts to be true for purposes of this motion as required.  Brainerd

18  did, however, admit that he told the deputy that he remembered that he had a softball equipment bag

19  containing a softball bat in the garage of the house, but states that he did not refer to a bat of any

20  kind during his argument with his roommates.  Brainerd Depo. at 67.  Brainerd acknowledges that

21  he told the officer that Brainerd commented that "someone should hit you in the head and knock

22  some sense into you because this is going to be a major thing for us to go through as far as losing

23  our home, possibly."  <u>Id</u>. at 69:20-24.

24     The deputies arrested Brainerd for violation of California Penal Code  § 422,[1] and advised

25

26     [1] That section provides in pertinent part: "Any person who willfully threatens to commit a crime
27  which will result in death or great bodily injury to another person, with the specific intent that the
    statement, made verbally, in writing, or by means of an electronic communication device, is to be taken
28  as a threat, even if there is no intent of actually carrying it out, which, on its face and under the
    circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to
    convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the

4

**United States District Court**
For the Northern District of California

1   him of the crime for which he was being arrested.  Wristen Decl. ¶ 7; Devincenzi Decl. ¶ 7.  When

2   Brainerd was arrested, according to Wristen, he admitted to consuming a couple of beers after work.

3   Wristen Decl. ¶ 8.  However, Brainerd maintains that he only had one beer after work, which is his

4   basic limit due to his medical condition, and the Court therefore relies on Brainerd's account.

5   Brainerd Decl. ¶ 10.  Wristen transported Brainerd to the Hill Road Correctional Facility where

6   Brainerd was booked on the charge of violating California Penal Code § 422.  Brainerd maintains

7   that he never told Wristen he was sorry he made the threat and that he would never hurt anybody.

8   Brainerd Decl. ¶ 11.  Wristen then prepared a narrative report regarding the dispatch and arrest.  <u>See</u>

9   Wristen Decl., Ex. A.

10          Brainerd advised the officers that he had an extremely serious and brittle case of Type I

11   diabetes that required a specific form of medical treatment, including Lantus, a drug to prevent

12   seizure and/or diabetic coma.  The officers refused to allow him to take the medication with him or

13   to take custody of it.  According to Wristen, he did not observe any signs of diabetic distress in

14   Brainerd, and Brainerd does not allege that he exhibited any outward signs of diabetic distress at the

15   time of his arrest.  Wristen Decl. ¶ 13.  Devincenzi recalls that Brainerd indicated he was diabetic

16   and wanted to take his medication with him.  Brainerd was told that only the medical staff

17   administers medication at the jail, and any drugs he had in his possession at the time of booking

18   would be locked up in property and would be inaccessible to him pursuant to jail policy.  Devincenzi

19   Decl. ¶ 9.  Brainerd's blood sugar increased to a count of 234 by the time he was in jail, above the

20   normal controlled range with Lantus which is 90-120.  Brainerd Decl. ¶ 26.  Brainerd maintains that

21   he was arrested at approximately 5:40 p.m. on May 19.  Opp. at 7:24-25.  Defendants document the

22   time of arrest at 5:59 p.m.

23                   2.      The Detention and Medical Treatment

24          Booking officers in the Lake County Sheriff's Department are required to prepare a booking

25   form, a pre-booking health form, and intake questionnaire for the arrested individual during

26   _____

27   threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for
    his or her immediate family's safety, shall be punished by imprisonment in the county jail not to exceed
28   one year, or by imprisonment in the state prison."  Cal. Penal Code § 422.

United States District Court
For the Northern District of California

1   booking. These forms were completed for Brainerd. Esberg Decl. ¶¶ 6-7, Exs. A&B. Lake County

2   jail personnel are trained to summon medical care for inmate medical conditions of which they

3   become aware. Id. ¶¶ 6-7.

4       Medical services at the jail are provided pursuant to contract by California Forensic Medical

5   Group ("CFMG"). Esberg Decl. ¶ 9. When Brainerd was booked, the pre-booking medical

6   information report and intake questionnaire were completed, reflecting that Brainerd is a Type I

7   diabetic. Esberg Decl. ¶ 8, Ex. C. Information concerning his medication was also obtained from

8   him. Id., Ex. C. Brainerd was referred to CFMG medical personnel for evaluation and treatment.

9   Id. Documentation of his medical treatment reflects that his first contact with medical personnel

10  was at 6:33 p.m. on May 19, 2005 when his blood sugar was tested. His medical treatment was

11  documented. Esberg Decl. ¶ 10, Ex. D.

12      According to Brainerd, despite informing jail staff that he needed Lantus, he was provided

13  with low doses of regular insulin. His diabetes became uncontrollable, and his blood sugar levels

14  reached into the range of 465 to 538. He experienced severe symptoms of his diabetic condition,

15  including seizure-like activities, confusion, and disorientation. Brainerd Decl. ¶ 28.[2]

16                      3.      Probable Cause Determination

17      On May 19, 2005, Wristen prepared a declaration supporting probable cause for arrest,

18  setting forth information pertinent to Brainerd's arrest. It appears that the District Attorney's office

19  rejected the case on May 20, 2005, noting: "de minimus, Suspect is 53 years old, has no prior record,

20  interest of justice served by arrest." Poore Decl., Ex. A. There is no evidence that the District

21  Attorney made any determination that probable cause was lacking. Nor is there evidence as to

22  whether any of the individual Defendants or jail personnel had notice of the District Attorney's

23  decision not to prosecute.

24      On May 21, 2005, the Hill Road Jail Facility was notified that Magistrate Judge Halstrom

25  had issued an order finding sufficient probable cause to detain Brainerd for a violation of California

26  _____

27      [2]  While for purposes of summary judgment, the Court considers these allegations to be true, the jail medical records show that Brainerd was given medications from May 19 through May 23, which included Lantus on May 19, May 20, May 21, and May 23. See Egberg Decl., Ex. D at Def. 7. At oral

28  argument, Plaintiff's counsel noted that Brainerd was given medications other than Lantus, when he should have been given Lantus only.

United States District Court
For the Northern District of California

1    Penal Code § 422. Esberg Decl. ¶ 11, Ex. A; Wristen Decl. ¶ 11. Brainerd never had a probable

2    cause hearing or any other hearing. Brainerd Decl. ¶ 29. He was released on Monday May 23, 2005

3    at approximately 11:30 a.m.

4    　　　　　　　4.    Brainerd's Release

5    　　　On May 23, 2005, the jail received notification from the District Attorney that charges

6    against Brainerd would not be pursued and that he should be released. Brainerd was released from

7    the jail on May 23, 2005 and was provided with a detention certificate. Esberg Decl. ¶ 12 and Ex. E.

8    He was released after a one-hour delay as personnel waited to receive a copy of a temporary

9    restraining order that had been issued against him so that it could be served on him before his

10    release, which it was. Esberg Decl. ¶ 13. He was initially released between approximately 10:00

11    and 10:30 a.m., but then subject to continued confinement for a period of about one hour while the

12    Sheriff's Department served a TRO against him obtained by Ms. Boyd. Brainerd Decl. ¶ 33.

13    **C.    Defendants' Motion**

14    　　　　　　　1.    Probable Cause for Arrest and Qualified Immunity

15    　　　The deputies were authorized to make a warrantless arrest of Brainerd if there was probable

16    cause. California Penal Code § 836(a)(2). Under California law, an officer has probable cause for a

17    warrantless arrest if the facts known to him would lead a person of ordinary care and prudence to

18    believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a

19    crime. Peng v. Hu, 335 F.3d 970, 976 (9th Cir. 2003). This is very similar to the Fourth

20    Amendment test, which provides that "probable cause exists when, under the totality of the

21    circumstances known to the arresting officers, a prudent person would have concluded that there was

22    a fair probability that [the suspect] had committed a crime." Id. (citation omitted).

23    　　　The elements of making a criminal threat pursuant to Penal Code § 422 are: "(1) that the

24    defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury

25    to another person,' (2) that the defendant made the threat 'with the specific intent that the statement

26    … is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the

27    threat—which may be 'made verbally, in writing, or by means of an electronic communication

28    device'—was 'on its face and under the circumstances in which it [was] made, … so unequivocal,

                                                    7

1   unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose

2   and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person

3   threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's

4   safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances." In re

5   Sylvester C., 137 Cal. App. 4th 601, 605 (2006); Cal. Penal Code § 422 (2008).

6          While the Court must take Brainerd's allegations regarding what he said to the officers as

7   true for purposes of summary judgment, factual disputes that are not material to what the officer

8   knew at the time of the arrest are irrelevant to the test of objective reasonableness, which is based

9   upon the relevant information that the officers had when the conduct occurred. Peng, 335 F.3d at

10  978. Furthermore, the presence of a factual dispute regarding a victim's complaint at the scene of an

11  alleged disturbance does not defeat probable cause if the victim's statements are sufficiently definite

12  to establish that a crime has been committed and the victim's complaint is corroborated by either the

13  surrounding circumstances or other witnesses. Id. at 979. Importantly, where a victim informs an

14  officer that a force or threat of force existed, it is important for officers to err on the side of safety

15  for the victim in order to prevent further violence. Id. at 978.

16         Here, the uncontested facts demonstrate that the officers had probable cause to arrest

17  Brainerd. The officers were presented with the statements by both of Brainerd's housemates, who

18  claimed that Brainerd was threatening to do physical harm to Boyd. While Brainerd disputes that he

19  made such threats and that a bat was in the residence, and while he notes that he was sitting quietly

20  in his room when the officers arrived at the residence, according to his own account he told the

21  officers he had a bat in the garage of the residence. Brainerd also admitted that he told Boyd that

22  somebody should hit Boyd in the head and knock some sense into him. See Brainerd Depo. at 69.

23  There is no dispute that Boyd and Ward exhibited fear. Brainerd attested that both were crying. Id.

24  at 75. That Brainerd disputed Boyd's and Ward's version of the events to the officers does not

25  defeat a finding that there was probable cause, which "exists when, under the totality of the

26  circumstances known to the arresting officers, a prudent person would have concluded that there was

27  a fair probability that [the suspect] had committed a crime." Peng v. Hu, 335 F.3d at 976. Here, the

28  victim's statements were sufficiently definite and were corroborated by the housemate witness.

1    Moreover, even if probable cause were lacking, the officers are entitled to qualified

2    immunity.  "A qualified immunity analysis must begin with this threshold question: based upon the

3    facts taken in the light most favorable to the party asserting the injury, did the officer's conduct

4    violate a constitutional right?  If no constitutional right was violated, the court need not inquire

5    further.  If, however, a constitutional violation occurred, the second inquiry is whether the officer

6    could nevertheless have reasonably but mistakenly believed that his or her conduct did not violate a

7    clearly established constitutional right."  Jackson v. Bremerton, 268 F.3d 646, 651 (9th Cir. 2001)

8    (citing Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151 (2001)).   The standard for qualified immunity

9    is the "'objective legal reasonableness' of the action, assessed in light of the legal rules that were

10   'clearly established' at the time it was taken."  Anderson v. Creighton, 483 U.S. 635, 638 (1987)

11   (citing Harlow v. Fitzgerald, 457 U.S. 800 (1982)).  If Defendants had a reasonable but mistaken

12   belief that their conduct was lawful, qualified immunity applies.  Saucier, 533 U.S. at 205-6.

13   Because the law is clearly established that officers required probable cause before arresting

14   Brainerd, the question is whether a reasonable officer could have believed that probable cause

15   existed to arrest the plaintiff.  See Franklin v. Fox, 312 F.3d 423, 437 (9th Cir. 2002).

16   Here, as discussed above, the officers were privy to two sufficiently detailed statements of

17   alleged victims that corroborated one another.  Brainerd has not pointed to any red flags indicating

18   that the officers should not have believed the roommates.  The officers also witnessed the witnesses'

19   demeanor, and found that they were fearful.  These statements were corroborated by Brainerd's own

20   concession that these two witnesses were crying.  The statement about Brainerd's threat to hit Boyd

21   with a bat, was further corroborated by Brainerd's admission that there was a bat in the garage, even

22   though he maintains there was no bat in the house or his room and that he never made such a threat.

23   While Brainerd certainly disputes many facts, they are not material here.  See Peng, 335 F.3d at 978-

24   79.  Even absent probable cause, qualified immunity is available here, as a reasonable police officer

25   could have believed that his conduct was lawful in light of the clearly established law and the

26   information the officers possessed.  Id. at 980.

27   In addition, as to the County Defendants, under 42 U.S.C. § 1983, municipalities are not to

28   be held liable "unless action pursuant to official municipal policy of some nature caused a

9

United States District Court
For the Northern District of California

1    constitutional tort." <u>Brass v. County of Los Angeles</u>, 328 F.3d 1192, 1198 (9th Cir. 2003) (citing

2    <u>Monell v. Dep't of Social Servs.</u>, 436 U.S. 658, 691 (1978)).  Both the Supreme Court and the Ninth

3    Circuit have recognized that the <u>Monell</u> standard governs a county's § 1983 liability.  <u>Brass</u>, 328

4    F.3d at 1198.  "[I]t is when execution of a government's policy or custom, whether made by its

5    law-makers or by those whose edicts or acts may fairly be said to represent official policy, inflicts

6    the injury that the government as an entity is responsible under § 1983."  <u>See id.</u> at 1198 (quoting

7    <u>Monell</u>).  Municipal liability can also be established if a violation, if random or isolated, was

8    undertaken or ratified by the municipal employee who had the final decision making authority on the

9    issue in question.  <u>Los Angeles Protective League v. Gates</u>, 907 F.2d 879, 889 (9th Cir. 1990).

10        Brainerd argues that the County of Lake had a mandatory arrest policy in domestic violence

11   cases.[3]  <u>See</u> Poore Decl., Ex. C.  To the extent that Brainerd requests more discovery to obtain

12   Defendants' policies and procedures in responding to domestic violence cases, Brainerd has not

13   made a proper Federal Rule of Civil Procedure 56(f) motion, has not shown by affidavit, for

14   specified reasons, that it cannot present facts essential to justify its opposition, and did not move to

15   compel earlier.  As to the policy attached as Exhibit C, Brainerd does not point out which pages or

16   portions of this 22-page policy support his argument.  In addition, the policy appears to be a

17   proposal, and there is no evidence that this policy was in effect or being implemented at the time of

18   Brainerd's arrest.  <u>See, e.g., id.</u> at 7 (describing proposal) and 18 (listing recommendations).

19   Therefore, this claim against the County fails for this additional reason.  For the above reasons,

20   summary judgment is proper as to this claim.

21             2.    Consent to Search

22        Brainerd does not contest that his housemates admitted the officers to the residence, fails to

23   aver that he opposed a search, and concedes that the officers made no search of the residence.

24   Brainerd Decl. ¶¶ 21, 25.  The Fourth Amendment generally prohibits searches or seizures

25   conducted without a warrant in a private residence.  <u>Payton v. New York</u>, 445 U.S. 573, 586 (1980).

---

27         [3]    Defendants object to Exhibit C on the basis of relevance, hearsay, and authentication.  As

28   for authentication, Poore declares that Exhibit C was produced by Defendants in discovery.  The policy seems generally relevant and appears to be a business record.  Defendants' objection is overruled and the Court has considered this document for purposes of this motion.  Defendants' objections to Brainerd's declaration are also overruled.

**United States District Court**
For the Northern District of California

1    Courts, however, recognize a few exceptions to the warrant requirement, one of which is the

2    voluntary consent of an individual possessing authority over the premises.  <u>Illinois v. Rodrigues</u>, 497

3    U.S. 177, 181 (1990).  The individual might be the householder whose property is searched,

4    <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 222 (1973), or a fellow occupant who shares common

5    authority over the premises, <u>United States v. Matlock</u>, 415 U.S. 164, 171 (1974).  Nevertheless, a

6    warrantless search of a shared dwelling for evidence over the express objection of a physically

7    present resident is not reasonable despite the consent given to the police by a co-occupant.  <u>Geogia</u>

8    <u>v. Randolph</u>, 547 U.S. 103, 120 (2006) (plurality opinion); <u>United States v. Murphy</u>, 516 F.3d 1117,

9    1124 (9th Cir. 2008) (holding that search was invalid as to an objecting co-tenant when the co-tenant

10   expressly objected to the search and another party with common authority subsequently gave

11   consent to that search after first co-tenant was taken away by police).

12           The co-tenant's permission suffices for a reasonable search unless the fellow tenant

13   expressly objects.  <u>Randolph,</u> 547 U.S. at 121.  Here, Brainerd was in his private room when the

14   police officers entered the house with the consent of Boyd and Ward.  Brainerd at no time expressly

15   objected to the presence of the officers in the house, or indeed objected in any other fashion.

16   Because Mr. Boyd and Ms Ward shared common authority over the house and because Brainerd did

17   not object to the entry of the officers, Defendants' entering the house without a search warrant does

18   not violate Brainerd's Fourth Amendment rights.  <u>Randolph</u>, 547 U.S. at 121.

19           Brainerd apparently objects more specifically to the officers' entry into his room.  While it is

20   true that Defendants have not offered any evidence indicating that Brainerd's roommates had joint

21   occupancy of Brainerd's bedroom or that his bedroom was a common area, <u>see</u> <u>United States v.</u>

22   <u>Matlock</u>, 415 U.S. 164 (1974) (where woman consented to search of house, including upstairs

23   bedroom in which defendant lived, court remanded for consideration of whether woman possessed

24   common authority over bedroom), Brainerd concedes that the officers did not conduct a search for

25   any bat in his room and does not allege that the officers looked for or seized any other items in his

26   room pursuant to a search.  Nor does he allege that he expressly objected when the officers entered

27   his room.

28           In addition, the officers were justified in entering the residence and Brainerd's room based

**United States District Court**
For the Northern District of California

1   on the complaint that harm was imminent.  The <u>Randolph</u> court explicitly held that police might

2   lawfully enter a dwelling even over express objection of an occupant to determine if domestic

3   violence has just occurred or is about to occur, as opposed to conducting a search in the dwelling.

4   <u>Id.</u> at 118.  The Ninth Circuit has also held that police officers could make proper inquiries

5   "designed to elicit information about any weapons that might be used by the disputants against each

6   other" in the context of a domestic violence dispute.  <u>United States v. Brooks</u>, 367 F.3d 1128, 1138

7   (9th Cir. 2004).  Therefore, summary judgment is proper as to this claim.

8                    3.    <u>Miranda</u> Issue

9          Brainerd's allegation that Defendants violated his rights by not advising him of his right to

10  counsel and against self-incrimination is beyond the scope of the amended complaint, and summary

11  judgment is proper for this reason.  In addition, the Supreme Court has stated that "a violation of the

12  constitutional right against self-incrimination occurs only if one has been compelled to be a witness

13  against himself in a criminal case."  <u>Chavez v. Martinez</u>, 538 U.S. 760, 770 (2003).  "After <u>Chavez</u>,

14  it is clear that a § 1983 plaintiff cannot succeed on a Fifth Amendment self-incrimination claim

15  predicated solely upon coercive police interrogation resulting in an involuntary confession."  <u>Crowe</u>

16  <u>v. County of San Diego</u>, 303 F. Supp. 2d 1050, 1088 (S.D. Cal. 2004) (citing <u>Chavez</u>).  While the

17  Supreme Court also noted that police could not use torture or other abuse that resulted in a

18  confession (even where such statements were not used at trial), and noted that unauthorized police

19  behavior that shocked the conscience might give rise to § 1983 liability, Brainerd has not articulated

20  any behavior here that was "egregious" or "conscience-shocking."  <u>Chavez</u>, 538 U.S. at 773-74.

21  Summary judgment is therefore proper on this issue, which was not asserted in the complaint.

22                   4.    Timely Determination of Probable Cause

23         "The Fourth Amendment requires a judicial determination of probable cause as a prerequisite

24  to extended restraint of liberty following arrest."  <u>Gerstein v. Pugh</u>, 420 U.S. 103, 104 (1975).  In the

25  case of warrantless arrests, the government must obtain a judicial determination of probable cause

26  within forty-eight hours of the arrest.  <u>County of Riverside v. McLaughlin</u>, 500 U.S. 44, 56 (1991);

27  <u>United States v. Bueno-Vargas</u>, 383 F.3d 1104, 1107 (9th Cir. 2004).  Jurisdictions that provide such

28  determinations, as a general matter, will be immune from systemic challenges, and comply with the

United States District Court
For the Northern District of California

1    promptness requirement of <u>Gerstein</u>. <u>McLaughlin</u>, 500 U.S. at 56. Where an arrestee does not

2    receive a probable cause determination within forty eight hours, the government bears the burden to

3    demonstrate "the existence of a bona fide emergency or other extraordinary circumstances." <u>Id.</u> at

4    57.[4]

5        The forty-eight hour limit does not mean that "the probable cause determination in a

6    particular case passes constitutional muster simply because it is provided within 48 hours."

7    <u>McLaughlin</u>, 500 U.S. at 56. Such a hearing may nonetheless violate the constitution if the arrested

8    individual can prove that the probable cause determination was delayed unreasonably. <u>Id.</u>;

9    <u>Hallstrom v. City of Garden City</u>, 991 F.2d 1473, 1479 (9th Cir. 1993). In evaluating allegations of

10   unreasonable delay, courts must allow "a substantial degree of flexibility," being mindful of

11   practical realities, such as unavoidable delays in transportation, handling late night bookings where

12   no magistrate is readily available, and obtaining the presence of an arresting officer who might have

13   other duties. <u>Id.</u> at 56-57. Examples of unreasonable delay include delays for purpose of gathering

14   additional evidence to justify the arrest, delay motivated by ill will against the arrestee, or delay for

15   delay's sake. <u>Id.</u> at 56.

16       Here, Brainerd was arrested between 5:40 p.m. and 5:59 p.m. on May 19, 2005. The same

17   day, Wristen prepared a Declaration for Probable Cause and Bail setting regarding Brainerd's arrest

18   under penalty of perjury. Wristen Decl. ¶ 11. The declaration was submitted to a magistrate judge

19   for a probable cause determination. <u>Id.</u> On May 21, 2005, at 12:30 p.m., a magistrate judge issued

20   an order that there was sufficient probable cause to detain Brainerd for a felony violation of

21   California Penal Code section 422. Esberg Decl., Ex. A at DEF 68; RJN Ex. E. Thus, the probable

22   cause determination was made approximately forty-two hours after Brainerd's arrest and can be

23   challenged only if he proves unreasonable delay by Defendants. <u>Hallstrom</u>, 991 F.2d at 1479.

24   While Brainerd takes issue with the authentication of the probable cause determination, the Court

25

26       [4] While Brainerd relies on numerous cases to demonstrate that delays of probable cause
     determination of less than forty-eight hours are unreasonable, most of these cases were decided prior
27   to <u>McLaughlin</u>. See Pl. Opp. at 14:4-16. Brainerd also relies on <u>Halvorsen v. Baird</u>, 146 F.3d 680, 688
     (9th Cir. 1998), but in that case, the court found that the six-hour confinement violated the plaintiff's
28   due process, not because the duration of the detention was unreasonably long, but because the plaintiff
     was held incommunicado.

**United States District Court**
For the Northern District of California

may and does take judicial notice of the document, which is authenticated in Crystal Esberg's declaration.  Brainerd does not submit any evidence to indicate that the probable cause determination was forged or inaccurate.  Brainerd's evidence that the courthouse was open on Friday, May 20, 2008, and that the other inmates booked on Thursday night received a probable cause hearing on May 20, 2008, see Brainerd. Decl. ¶ 30, does not raise a triable issue of material fact, because determination of probable cause on the papers is constitutionally sufficient.  As Brainerd points out, the District Attorney's office rejected the case on May 20, 2005, which was before the matter was submitted to the Magistrate for a probable cause determination.  See Poore Decl., Ex. A.  However, there is no indication that the District Attorney's determination was based on lack of probable cause; rather, the District Attorney pointed to the suspect's age, lack of prior record, and the fact that the interests of justice were served by the arrest.  There is no evidence as to when, if at all, either arresting officer learned of the determination by the District Attorney's office, and Wristen drafted his probable cause declaration before that determination was made.  This case is therefore unlike Llaguno v. Mingey, 739 F.2d 1186 (7th Cir. 1984), a decision rendered prior to McLaughlin, in which the District Attorney specifically and repeatedly told the officers that they were not prosecuting the defendant due to insufficient evidence.  Nor has Brainerd submitted evidence that the decision to keep him in jail over the weekend or the submission of his case to a Magistrate Judge after the District Attorney's office decided not to prosecute was made pursuant to a County policy or practice or was ratified by anyone with final decision-making authority.

As to Brainerd's contention that he was entitled to a probable cause *hearing*, the Fourth Amendment does not require the probable cause determination be furnished with "the full panoply of adversary safeguards – counsel, confrontation, cross-examination, and compulsory process for witnesses."  Gerstein, 420 U.S. at 119.  The issue of whether there is probable cause for detaining the arrested person pending further proceedings can be determined reliably without an adversary hearing.  Id. at 120.  The standard "traditionally has been decided by a magistrate in a nonadversary proceeding on hearsay and written testimony."  Id.; see also Jones v. City of Santa Monica, 382 F.3d 1052, 1056 (9th Cir. 2004) (holding that a pre-printed warrant application submitted to a judge for a probable cause determination is constitutionally sufficient, as long as it is accompanied by an

14

United States District Court
For the Northern District of California

affidavit that sets forth facts supporting probable cause and sufficiently incorporate the affidavit). The Constitution does not require the arrestee's personal appearance at the post-arrest probable cause determination. Jones, 382 F.3d at 1055. Probable cause determinations "can be made solely on the basis of written affidavits and do not require the services of any personnel beyond the judicial officer." United States v. Van Poyck, 77 F.3d 285, 289 n.6 (9th Cir. 1996); see also Bueno-Vargas, 383 F.3d at 1107-10 (penalty-of-perjury declaration by the officer satisfied the "oath or affirmation" requirement of the Fourth Amendment). Here, Wristen's declaration was sworn. See Wristen Decl., Ex. B.

Brainerd also argues that the facts in Wristen's declaration were false. Wristen's probable cause declaration states that the suspect threatened to hit the roommate in the head with a baseball bat, the victim felt that the threat would be carried out, a bat was in reach of the suspect but never touched, and that suspect admitted to making the threat but said he never meant it. Wristen Decl., Ex. B. First, summary judgment is proper as to this part of the claim, because it was not pled in the complaint. In addition, "a plaintiff can only survive summary judgment on a defense claim of qualified immunity if the plaintiff can both establish a substantial showing of a deliberate falsehood or reckless disregard and establish that, without the dishonestly included or omitted information, the magistrate would not have issued the warrant. Put another way, the plaintiff must establish that the remaining information in the affidavit is insufficient to establish probable cause." Hervey v. Estes, 65 F.3d 784, 789 (9th Cir. 1995). While there is a dispute as to whether the bat was in reach of Brainerd and as to whether Brainerd admitted making the threat, there is no dispute that Ward and Boyd reported that Brainerd threatened them and that they exhibited a fearful demeanor. There is therefore enough information in the declaration without the statement of the bat being within reach and the suspect's admission to establish probable cause.

As to Brainerd's complaint about post-release delay, Brainerd alleges that the county jail continued to detain him for approximately one hour after his official release was ordered at 10:20 a.m. on May 23, 2005. Brainerd Decl. ¶ 33. According to Brainerd, the jail staff informed him that he would be held until they received a civil temporary restraining order for service upon him. Id. During this one hour period, Brainerd was allegedly locked-up inside the jail and was not free to

United States District Court
For the Northern District of California

1  leave.  Id.  Assuming that there is a legal theory under which it is impermissible to deliberately hold

2  Brainerd for a brief additional period of time in these circumstances, he does not allege the existence

3  of a specific county policy or custom that caused the one-hour delay of his release (or ratification of

4  a decision by one with final decision-making authority).  Brainerd only contends, without authority,

5  that this conduct "constituted a per se violation of plaintiff's Fourth Amendment rights."  Id.

6  Brainerd, therefore, fails to state a claim of unconstitutional policies or unconstitutional

7  implementation of policies, for which the county could be held liable.  As to Defendants Wristen and

8  Devincenzi, there is no evidence connecting them in any way to Brainerd's release from the jail.

9                          5.     Medical Treatment

10         Brainerd has submitting evidence showing that while at the jail, he was given improper

11 medication that allowed his diabetes to get out of control.  While Defendants argue that Brainerd

12 submits no competent medical evidence that only Lantus controls his diabetes, he does state that the

13 insulin that the jail provided to him did not work, that he informed the medical staff that he was

14 prescribed and needed Lantus, that his blood sugar levels became out of control, and that he

15 experienced diabetic symptoms.

16         "A prison official cannot be found liable under the Eighth Amendment for denying an

17 inmate humane conditions of confinement unless the official knows of and disregards an excessive

18 risk to inmate health or safety; the official must both be aware of facts from which the inference

19 could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."

20 Farmer v. Brennan, 511 U.S. 825, 837 (1994).  "[Deliberate] indifference may be manifested in two

21 ways.  It may appear when prison officials deny, delay or intentionally interfere with medical

22 treatment, or it may be shown by the way in which prison physicians provide medical care.  Mere

23 negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's

24 Eighth Amendment rights."  Hutchinson v. United States, 838 F.2d 390, 394 (9th Cir. 1988)

25 (citations omitted).

26         Brainerd has not sued CFMG, the independent contractor used by the jail to provide medical

27 services, or any individual person in the jail responsible for his medical treatment.  Nor has he

28 alleged any policy or practice or ratification by the County or Sheriff's Department that gave rise to

**United States District Court**
For the Northern District of California

1  his medical injury.  There is nothing unconstitutional regarding the jail's policy prohibiting arrestees

2  from bringing medications into the jail, which may be justified to control contraband in the jail,

3  provided that the care provided by the jail, including provision of medications, meets the

4  constitutional standard for medical treatment.  As to Wristen and Devincenzi, Brainerd alleges that

5  he told the arresting officers that he was diabetic and needed Lantus to control his diabetes and that

6  he was not allowed to bring his Lantus to the jail, the uncontested facts show that the jail personnel

7  determined Brainerd's diabetic status when he was brought to jail and that they referred him to

8  CFMG for treatment within the hour.  While Brainerd maintains that the officers should have

9  relayed the information that he needed Lantus to the jail staff, Brainerd admitted that he told the jail

10  staff that he needed Lantus, and the officers' alleged failure to relay such information did not cause

11  any injury.  In addition, while Brainerd alleges that his blood sugar level was elevated by the time he

12  got to the jail, he does not allege that he showed any signs of medical distress in the arresting

13  officers' presence.  There is no evidence that the officers observed him in any serious medical

14  distress or condition.  Therefore, summary judgment is proper on this claim.

15  **III.    CONCLUSION**

16          In accordance with the foregoing, the court GRANTS Defendants' motion for summary

17  judgment and OVERRULES Defendants' evidentiary objections.  This order terminates this case

18  and any pending motions.  The clerk shall close the case file.

19          **IT IS SO ORDERED.**

20  Dated: August 6, 2008

21  _____
    ELIZABETH D. LAPORTE
    United States Magistrate Judge

17